## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CARMEN SOUTHWARD and KRISTIN KULICK,**<br><br>       **Plaintiffs,**<br><br>   **v.**<br><br>**ELIZABETH BOARD OF EDUCATION, OLGA HUGELMEYER, individually and in her official capacity as Superintendent, PABLO MUNOZ, individually and in his official capacity as former Superintendent, HAROLD KENNEDY, JR., individually and in his official capacity as Board of Secretary, DONALD GONCALVES, individually and in his official capacity as Assistant Board Secretary, RAFAEL FAJARDO, individually and in his official capacity as board member, FRANCISCO GONZALES, individually and in his as capacity board member, PAUL PEREIRA, individually and in his capacity as board member, CARLOS TRUJILLO, individually and in his capacity as board member, ELCY CASTILLO-OSPINA, individually and in her capacity as board member, TONY MONTEIRO, individually and in his capacity as board member, OSCAR OCASIO, individually and in his official capacity as Director of Process Improvement, and JOHN DOES 1-10,**<br><br>       **Defendants.** | Civil Action No. 15-3699 (KM)<br><br>**OPINION** |

### MCNULTY, District Judge

  This matter comes before the Court upon Defendants' motion (ECF No. 29) to dismiss the Amended Complaint under Federal Rule of Civil Procedure

12(b)(6). For the reasons stated below, the motion is GRANTED in part without prejudice, and DENIED in part.

This Opinion is organized as follows:

I.      Background

II.     Legal Standards On Motion to Dismiss

III.    Claims Asserted by Southward

    A.      CEPA (Count 1)

        i.      Legal standards under CEPA

        ii.     Discussion of Southward's Count 1 CEPA Claim

            1.      Statute of limitations

            2.      Notice-exhaustion requirement

            3.      Liability of individual defendants

    B.      First Amendment and NJCRA (Counts 4, 5)

        1.      Statute of limitations

        2.      Causation

        3.      Other grounds

IV.    Claims Asserted by Kulick

    A.      CEPA (Count 2)

    B.      First Amendment and NJCRA (Counts 3, 5)

        1.      Liability of individual defendants

        2.      Other grounds

V.     NJ RICO

## I.    BACKGROUND

Joined together in this Complaint are claims brought by two employees of the public school system who were dismissed in June 2014. Although the claims are similar, the supporting facts are distinct, and I summarize them separately.[1]

---

[1]     As I must, I take the factual allegations of the complaint as true for purposes of resolving a motion to dismiss. *See* Section II, *infra,* and cases cited.

### A. Southward's Factual Allegations

Plaintiff Carmen Southward was first employed by defendant Elizabeth Board of Education (the "Board") in 2006 as a teacher. (ECF No. 26, Amended Complaint (cited as "AC") ¶ 20). In July 2009, she became Interim Supervisor for Recruitment and Hiring in the Human Resources Department. (*Id.* ¶ 24).

Southward claims that in 2010 and 2011 (during her time as a Supervisor in the Human Resources Department) she reported misconduct by Director of Education Daphne Marchetti. Southward's alleged whistleblowing consisted of complaints about (i) personnel actions and violations of Board policy regarding teacher credentials (after learning that Marchetti did not possess the required state certifications to work as either a teacher or an administrator for the Board) (AC ¶¶ 28–30); (ii) misuse of vacation time (after learning that Marchetti had a secretary in the Human Resources Department reload all of her vacation days back into the system) (*id.* ¶¶ 34–35); and (iii) improper taking of maternity leave (after learning that Marchetti provided a forged medical certificate to obtain extended leave) (*id.* ¶¶ 43–46). In the same 2010–11 period, Southward (i) objected to the request of defendant Rafael Fajardo to hand out "political pins at HR interviews of new candidates" (*id.* ¶¶ 26–27, 166); (ii) refused to approve the hiring of a Board–backed, non–tenured candidate because there were other tenured candidates on the hire list (*id.* ¶ 42, 164); and (iii) refused to alter employment paperwork for Fajardo (*id.* ¶ 165).

Southward alleges that her whistleblowing, defined to include refusal to cooperate with improper conduct, led to retaliation. In 2010 and 2011, (i) defendant Pablo Munoz, who was then the Superintendent, told her to stop reporting about teacher–credential issues and undermined her job functions by limiting her ability to recommend personnel actions related to transfers, new hires, and non–renewals (AC ¶¶ 31, 36–38); (ii) defendant Francisco Gonzales contacted her at home to warn her that things would get "ugly" because she

3

had reported Marchetti's violations (*id.* ¶ 56); (iii) Munoz, at a cabinet meeting, asked if anyone wanted to address the serious concerns with Southward's handling of the vacancies in Elizabeth's schools (i.e., Southward's refusal to hire the Board members' preferred candidates) (*id.* ¶¶ 51–52); (iv) she received a letter of reprimand related to the vacancy issues raised at the meeting (*id.* ¶ 54–55); (v) she received a negative performance evaluation by her supervisor for the first time (*id.* ¶¶ 64–65); (vi) in February 2011 she was demoted from her position as Supervisor of Human Resources and transferred from the main office to School 28 (*id.* ¶¶ 57–59); and (vii) in June 2011 she was transferred out of Human Resources to the Food Services Department (*id.* ¶ 73).

In her new position as Interim Supervisor of Food Services, Southward learned that "some board members, teachers and administrators were receiving free lunches, when same should have been reserved for the students whose economic status qualified them to receive free meals through the school." (AC ¶ 76). In the summer of 2011, Southward reported the abuse of the federal school lunch program to the Union County Prosecutor, the New Jersey Attorney General's Office, and the Federal Bureau of Investigation ("FBI"). (*Id.* ¶¶ 76–78). She met with law enforcement officials through the rest of 2011, 2012, and 2013, and reported additional violations of the Board's personnel policies and the use of paid time for political activities. (*Id.* ¶¶ 89, 79–80).

In July 2013, Southward heard secondhand that the defendants were aware she had been speaking to the FBI. (AC ¶ 90). In April 2014, she was informed that Fajardo had obtained a copy of her interview notes with the FBI. (*Id.* ¶ 91). On June 13, 2014, Southward was notified that she would be terminated effective June 30, 2014. (*Id.* ¶ 93). For the two weeks preceding her termination, Southward was sent to what was colloquially known as the "rubber room," where she remained in "solitary confinement" without a phone or computer. (*Id.* ¶ 94).

4

## B. Kulick's Factual Allegations

Plaintiff Kristin Kulick was the Board's Director of Special Projects beginning in August 2009. (AC ¶ 104). She, too, alleges that she blew the whistle on improper conduct in the school system.

In the spring of 2010, Kulick raised concerns that her co–worker Amy Gomes, who was the fiancée of defendant Tony Monteiro, was arriving to work late and sometimes visibly intoxicated. (*Id.* ¶ 109). Kulick informed Karen Murray, then the Director of Human Resources (who happens to be Kulick's sister), about Gomes's conduct. (*Id.* ¶ 111). Murray raised concerns about promoting Gomes, after which Murray was placed on administrative leave and ultimately terminated. (*Id.* ¶ 112). Afterwards, defendant Goncalves warned Kulick that her sister's termination "doesn't have to affect you, unless you want it to," a remark Kulick perceived as a threat. (*Id.* ¶ 113).

Four years later, in the spring of 2014, Kulick resumed her whistleblowing. At a Director's Association union meeting, she raised concerns that she and other Directors had not received the merit pay to which they were entitled under a 2012 Memorandum of Agreement. (AC ¶ 115). Defendant Ocasio told Kulick that "he was privy to information regarding certain individuals who were going to be 'let go' and told Ms. Kulick that she should not be asking questions like that at that time." (*Id.* ¶ 117). Nevertheless, Kulick submitted a written request to defendant Munoz that Directors receive their merit pay. (*Id.* ¶ 120). Kulick asserts that the termination of her employment in June 2014 was in retaliation for these activities. (*Id.* ¶¶ 115–21).

Kulick also asserts that she was punished for refusing to participate in political activities. In support, she alleges that shortly after she was hired in 2009, Annie Rooney, defendant Munoz's secretary, informed her that she was expected to purchase tickets to the Board members' political fundraisers and events. (AC ¶¶ 128–31). Out of fear, Kulick did purchase tickets. (*Id.* ¶¶ 128–31).

Kulick alleges that she was harassed and forced to contribute time and money to political campaigns, and that for a time she acquiesced. (AC ¶¶ 131–35). Specifically, Kulick alleges that she was harassed and threatened by defendant Fajardo, who (although not a Board member at the time) controlled new hires and ran many of the Board members' political campaigns from his private business office. (*Id.* ¶¶ 136–37). In 2012 and 2013, Fajardo called Kulick and left threatening voice messages to induce her to contribute more to the campaigns of Board members. (*Id.* ¶¶ 138–46). After Kulick refused to purchase expensive tickets for a fundraiser, defendant Goncalves told her during a June 2013 performance evaluation that "none of us are safe." She perceived this statement as a threat to her job. (*Id.* ¶¶ 147–49).

In September 2013, a Board–backed campaign led to the creation of a non–profit charity, to which Kulick refused to contribute. (AC ¶¶ 150–51). In January 2014, Goncalves sent Ocasio to monitor Kulick's meetings, with the intent of intimidating her into changing her stance on fundraising issues. (*Id.* ¶ 152). Finally, in May 2014, Kulick was told to pressure two school principals to encourage their students to attend the Elizabeth Cuban Day parade. (*Id.* ¶ 153). After a low turnout at the parade, Kulick was reprimanded and harassed. (*Id.* ¶ 154). Thereafter, Kulick altogether stopped contributing her time and money to Board–backed campaigns. (*Id.* ¶¶ 155–56). In June 2014, Kulick was terminated from her position and replaced by Ocasio, who was politically connected but had qualifications inferior to those of Kulick. (*Id.* ¶¶ 157–58).

## C. Procedural History

Plaintiffs initiated this action on June 2, 2015. (ECF No. 1). On August 14, 2015, Defendants moved to dismiss Plaintiff's original Complaint under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 6). The Hon. Esther Salas, U.S.D.J., held oral argument on March 22, 2016, and stated reasons on the record for her decision to dismiss the original complaint. (ECF No. 23). The following day, Judge Salas entered an order granting Defendants' motion to

dismiss the complaint, without prejudice to the filing of an amended complaint within 30 days. (ECF No. 24).

Accordingly, on April 21, 2016, the plaintiffs filed the Amended Complaint (ECF No. 26). Jurisdiction is premised on 28 U.S.C. §§ 1331 (federal question), 1343(3) (federal civil rights claims), and 1367 (ancillary jurisdiction over state law claims). The causes of action pled in the Amended Complaint are:

Count 1: New Jersey Conscientious Employee Protection Act ("CEPA") (Southward);

Count 2: CEPA (Kulick)

Count 3: 42 U.S.C. § 1983/First Amendment retaliation (Kulick)

Count 4: 42 U.S.C. § 1983/First Amendment retaliation (Southward)

Count 5: New Jersey Civil Rights Act ("NJCRA") (both plaintiffs)

Count 6: New Jersey Racketeer Influenced and Corrupt Organization Statute ("NJRICO") (both plaintiffs).

That Amended Complaint is the currently operative pleading.

On May 20, 2016, Defendants filed this motion to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) (*See* ECF No. 29-1, Brief in Support of the Board Defendants' Motion to Dismiss the Amended Complaint ("Def. Br.")). On June 20, 2016, Plaintiffs filed a brief in opposition (ECF No. 35, Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("Pl. Br.")). On June 28, 2016, Defendants filed a reply (ECF No. 37, Reply Brief in Support of Defendants' Motion to Dismiss the Amended Complaint ("Def. Reply Br.")).

After the motion to dismiss was fully briefed, it was administratively terminated pending reassignment. (ECF no. 42) On January 5, 2017, the case was formally reassigned from Judge Salas to me. (ECF no. 45) I have reinstated the motion to dismiss and reviewed the matter afresh, and I decide the defendants' motion to dismiss as follows.

## II.   LEGAL STANDARDS ON MOTION TO DISMISS

Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss under Rule 12(b)(6), a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501, 95 S. Ct. 2197 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

Fed. R. Civ. P. 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' ... it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

The United States Court of Appeals for the Third Circuit has explicated the *Twombly/Iqbal* standard on several occasions. *See, e.g., Argueta v. U.S. Immigration & Customs Enforcement*, 643 F.3d 60, 70–73 (3d Cir. 2011); *Santiago v. Warminster Twp.*, 629 F.3d 121, 129–30 (3d Cir. 2010). In doing so, it has provided a three-step process for analyzing a Rule 12(b)(6) motion:

> To determine whether a complaint meets the pleading standard, our analysis unfolds in three steps. First, we outline the elements

a plaintiff must plead to a state a claim for relief. *See* [*Iqbal*, 556 U.S.] at 675; *Argueta*, 643 F.3d at 73. Next, we peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. Finally, we look for well-pled factual allegations, assume their veracity, and then "determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. This last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

*Bistrian v. Levi,* 696 F.3d 352, 365 (3d Cir. 2012).

"In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); *see also In re Asbestos Products Liability Litigation (No. VI)*, 822 F.3d 125, 134 & n.7 (3d Cir. 2016); *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case.").

## III.   CLAIMS ASSERTED BY SOUTHWARD

### A.   CEPA (Count 1)

Count 1, asserted by plaintiff Southward, brings a claim of retaliation under the New Jersey CEPA statute. Southward's allegations of retaliatory acts in Count 1 fall into two distinct categories: (i) in 2010 and 2011, during her time as Supervisor of Human Resources, she was subjected to harassment and unwanted transfers (in retaliation for raising complaints related to personnel policies and hiring preferences); and (ii) from June 13–30, 2014, she was exiled to the "rubber room" and ultimately discharged (in retaliation for providing information to law enforcement).

9

### i.   Legal standards under CEPA

Under CEPA, an "employer shall not take any retaliatory action against an employee because the employee . . . [o]bjects to, or refuses to participate in any activity, policy, or practice which the employee believes (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . .; (2) is fraudulent or criminal; or (3) is incompatible with a clear mandate of public policy concerning the public health, safety, or welfare or protection of the environment." N.J. Stat. Ann. § 34:19-3c.

To plead a CEPA claim, a plaintiff must demonstrate that "(1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a 'whistle-blowing' activity . . . ; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action." *Clayton v. City of Atl. City*, 722 F. Supp. 2d 581, 588-89 (D.N.J. 2010) (citing *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003)); *see also Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 404 (3d Cir. 2007).

A plaintiff alleging a CEPA violation need not prove that law or public policy was actually contravened—rather, the plaintiff "must show that he or she 'reasonably believes' that to be the case." *Dzwonar*, 828 A.2d at 900. Thus the complaint need not establish such a violation factually. *See id.* at 901 (citing *Blackburn v. United Parcel Serv., Inc.*, 3 F.Supp.2d 504, 514 n. 5 (D.N.J. 1998) (Barry, J.), *aff'd on other grounds*, 179 F.3d 81 (3d Cir.1999)). Nevertheless—and this is an issue of law for the court—there must be an identifiable "law, or a rule or regulation promulgated pursuant to law" N.J. Stat. Ann. § 34:19-3c(1), or else "a clear mandate of public policy concerning the public health, safety or welfare," N.J. Stat. Ann. § 34:19-3c(3). *Mehlman*, 707 A.2d at 1012–13; *Dzwonar*, 828 A.2d at 900–01.

The requirement of a law, rule, or regulation under section 3c(1) is clear enough. A "clear mandate of public policy" under section 3c(3) is a broader

category, but is not unconfined. Such a mandate must at least "convey[] a legislative preference for a readily discernible course of action that is recognized to be in the public interest." *Massarano v. New Jersey Transit*, 948 A.2d 653, 662 (N.J. Super. Ct. App. Div. 2008). "'Clear mandate' . . . suggests an analog to a constitutional provision, statute, and rule or regulation *promulgated pursuant to law* such that, under Section 3c(3), there should be a high degree of public certitude in respect of acceptable versus unacceptable conduct." *Maw v. Advanced Clinical Comms., Inc.*, 846 A.2d 604, 607 (N.J. 2004) (emphasis in original). "'A vague, controversial, unsettled, or otherwise problematic public policy does not constitute a clear mandate.'" *Smith-Bozarth v. Coal. Against Rape & Abuse, Inc.*, 747 A.2d 322, 325 (N.J. Super. Ct. App. Div. 2000), *abrogated on other grounds by Dzwonar, supra* (quoting *MacDougall v. Weichert*, 677 A.2d 162, 167 (1996)). "Sources of public policy include the United States and New Jersey Constitutions; federal and state laws and administrative rules, regulations and decisions; the common law and specific judicial decisions; and in certain cases, professional codes of ethics." *MacDougall*, 677 A.2d at 167.

A "retaliatory action," for purposes of CEPA, "means the discharge, suspension, or demotion of an employee, or other adverse employment action taken against an employee in terms and conditions of employment." N.J. Stat. Ann. § 34:19-2(e). Interpreting that language, some courts have held that the employer's action must affect the employee's compensation or rank, or "be virtually equivalent to discharge." *Klein v. Univ. of Med. & Dentistry of New Jersey*, 871 A.2d 681, 691 (N.J. Super. Ct. App. Div. 2005); *see also Caver v. City of Trenton*, 420 F.3d 243, 249 (3d Cir. 2005). Other decisions, with which I agree, have taken a somewhat broader view. Examples of actionable retaliatory acts have included suspensions, demotions, changes to the length of the workday, changes in salary, hours, fringe benefits, or "physical arrangements and facilities," and altered "promotional procedures." *Beasley v. Passaic County*, 873 A.2d 673, 685-86 (N.J. Super. Ct. App. Div. 2005); *see also Smith*

*v. Twp. Of E. Greenwich*, 519 F. Supp. 2d 493, 511 (D.N.J. 2007) *aff'd*, 344 F. App'x 740 (3d Cir. 2009), as amended Nov. 3, 2009 (quoting same language).

Alternatively—*i.e.*, short of discharge, suspension, or demotion—an adverse employment action may be established by "many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct." *Green v. Jersey City Bd. of Ed.*, 828 A.2d 883, 891 (N.J. 2003); *Maimone v. City of Atl. City*, 903 A.2d 1055, 1063–64 (N.J. 2006); *Nardello v. Twp. of Voorhees*, 873 A.2d 577, 580 (N.J. Super. Ct. App. Div. 2005). By analogy to a Title VII hostile work environment, we might call this a retaliatory environment.

### ii.    Discussion of Southward's Count 1 CEPA Claim

For dismissal of Southward's Count 1 CEPA claim, Defendants assert three grounds, which I discuss in turn.

### 1. Statute of Limitations

Defendants first assert that Southward's CEPA claims are barred by the statute of limitations. The statute of limitations, although an affirmative defense, may be raised on a Rule 12(b)(6) motion if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Bethel v. Jendoco Const. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978) (quoting *Hanna v. U.S. Veterans' Admin. Hosp.*, 514 F.2d 1092, 1094 (3d Cir. 1975)); *Cito v. Bridgewater Twp. Police Dep't*, 892 F.2d 23, 25 (3d Cir. 1989). "If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Bethel*, 570 F.2d at 1174.

For a CEPA claim, the statute of limitations is one year. N.J. Stat. Ann. § 34:19-5. In general, an act of retaliation is what perfects a CEPA claim. A CEPA claim therefore accrues, and the one-year limitations period begins to run, on the date of the retaliatory employment action that is the basis for the claim. *Ivan v. Cty. of Middlesex*, 595 F. Supp. 2d 425, 466-67 (D.N.J. 2009).

Because this action was filed on June 2, 2015, any CEPA cause of action that accrued after June 2, 2014 would be timely. Southward alleges acts of retaliation in connection with her termination, dating from June 13–30, 2014. Defendants concede that Southward's claims based on those June 2014 events are timely. (*See generally* Def. Br.; *see also* Mar. 22, 2015 Oral Argument Transcript ("Tr.") at 15-16.)

On the other hand, any CEPA cause of action that accrued before June 2, 2014, would not be timely. As outlined above, Southward alleges that the defendants subjected her to various acts of retaliation in 2010–11, and Defendants urge that CEPA claims based on those acts are time-barred. Southward responds that the 2010–11 acts were not discrete, but part of a "continuing violation." Her CEPA claim, she says, encompasses a whole series of retaliatory events from 2010 through June 2014, and because that series extends into the limitations period, the claim is timely. (Pl. Br. 8)

The "continuing violation" doctrine is "an equitable exception to the statute of limitations"; it provides that, where "an individual experiences a continual, cumulative pattern of tortious conduct," the limitations period may be tolled "until the wrongful action ceases." *Roa v. Roa*, 985 A.2d 1225, 1231 (N.J. 2010). Thus the continuing violation doctrine "allows a plaintiff to pursue a claim for discriminatory conduct if he or she can demonstrate that each asserted act by a defendant is part of a pattern and at least one of those acts occurred within the statutory limitations period." *Sarno v. Wal-Mart Stores E., L.P.*, No. CIV.A. 12-002075 JAP, 2012 WL 5880361, at *4 (D.N.J. Nov. 20, 2012) (quoting *Smith v. Twp. of E. Greenwich*, 519 F. Supp. 2d 493, 505 (D.N.J. 2007) (quotations and citations omitted)). It is well settled that the continuing violation theory, which is common to antidiscrimination statutes, applies to CEPA. *Green v. Jersey City Bd. of Educ.*, 828 A.2d 883, 891–92 (N.J. 2003).

The scope of the continuing violation theory, however, has been confined by case law; it is not a catchall for time-barred claims. *See Roa*, 985 A.2d at 1233. In applying the continuing violation theory to CEPA, the New Jersey

13

Supreme Court in *Green, supra,* adopted the restrictive analytical framework
defined in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S. Ct.
2061, 2072 (2002), a federal Title VII case. *See also Roa,* 985 A.2d at 1231–32
(adopting *Morgan* analysis for analogous claim under New Jersey Law Against
Discrimination). Within the *Morgan* framework, the essential question is
whether the acts of retaliation are discrete (and therefore independently
actionable) or nondiscrete (and therefore actionable as part of a series of
events).

In *Morgan,* the plaintiff alleged both discrete retaliatory/discriminatory
acts and a nondiscrete claim of a racially hostile work environment. For statute
of limitations purposes, the Court drew a key distinction. A hostile environment
claim, it held, could be considered a continuing violation because it is "a series
of separate acts that collectively constitute one 'unlawful employment practice'"
under the substantive law. 536 U.S. at 117, 122 S. Ct. at 2074. In contrast,
claims based on discrete acts made actionable under the statute in question
would not be analyzed collectively:

> [D]iscrete discriminatory acts are not actionable if time barred,
> even when they are related to acts alleged in timely filed charges.
> Each discrete discriminatory act starts a new clock for filing
> charges alleging that act. The charge, therefore, must be filed
> within the [statutorily prescribed] time period after the discrete
> discriminatory act occurred. The existence of past acts and the
> employee's prior knowledge of their occurrence, however, does not
> bar employees from filing charges about related discrete acts so
> long as the acts are independently discriminatory and charges
> addressing those acts are themselves timely filed. Nor does the
> statute bar an employee from using the prior acts as background
> evidence in support of a timely claim.

*Id.* at 113, 122 S. Ct. at 2072 (quoted in *Roa,* 985 A.2d at 1231–32).

Any competent lawyer could plausibly plead that acts of retaliation
against a single person are linked. That relaxed approach to the continuing
violation doctrine, however, has been foreclosed by case law. As the Third
Circuit has confirmed, *Morgan* promulgated a "bright-line" rule that
"individually actionable allegations cannot be aggregated" for purposes of the

continuing violation doctrine. *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006). Such independently actionable acts "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113, 122 S. Ct. at 2072. In short, a plaintiff does not retain the option to aggregate acts that are discrete and actionable.

What acts, then, are regarded as discrete under CEPA? Roughly, actions such as dismissal, suspension, or demotion, or other actions affecting basic conditions of employment, upon which an independent CEPA claim can be based. *See* N.J. Stat. Ann. § 34:19-2(e). Nondiscrete actions would encompass a series of less serious acts that nevertheless, in the aggregate, add up to a unitary, actionable pattern of retaliation. *See Green*, 828 A.2d at 891.

Judge Joel Pisano of this District (now retired) summarized the range of "discrete" CEPA claims thus:

> Plaintiff's claims cannot be saved under the continuing violation theory because an employer's failure to promote is quintessentially a discrete employment action. [citing *Morgan*, 536 U.S. at 113–115] ("Each discrete discriminatory act starts a new clock for filing charges alleging that act. Discrete acts such as ... failure to promote ... are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.' "); *see also Rush v. Scott Specialty Gases*, 113 F.3d 476, 483–84 (3d Cir. 1997) (holding that plaintiff's failure to promote claim and train claims are "discrete instances of alleged discrimination that are not susceptible to a continuing violation analysis."). Likewise, retaliatory discipline actions are considered discrete employment actions. [citing *O'Connor*, 440 F.3d at 127] (following *Morgan* and discussing types of discrete acts that are not susceptible to the continuing violations doctrine, including "wrongful discipline" and "failure to promote"); *see also Gadson v. City of Wilmington Fire Dep't*, 478 F. Supp. 2d 635 (D.Del.2007) (holding that plaintiff's claims of "disparate treatment in defendant's imposition of discipline, as well as 'hiring and promotional policies and practices' which have a disparate impact" are discrete acts that "cannot be aggregated under a continuing violations theory").

*Sarno*, 2012 WL 5880361, at *4. I take Judge Pisano's summary as a guide in analyzing Southward's claims.

Southward claims, *inter alia*, that in 2010–11 the defendants retaliated against her by reassigning her and downgrading her job duties. Such acts, I find, fall on the "discrete" side of the line drawn by *Morgan*, because they would individually give rise to actionable CEPA claims.

Southward claims, for example, that "beginning in the summer of 2010, Defendant Munoz vastly limited her ability to perform the job responsibilities consistent with her position as Supervisor of Human Resources." (AC ¶¶ 28-38). Munoz's *de facto* demotion of Southward was a discrete, actionable adverse employment action that was completed in the summer of 2010. Assuming (as I must) that it occurred, it would have been actionable at that time. It therefore immediately triggered the running of the one-year CEPA statute of limitations. *See O'Connor*, 440 F.3d at 127 (defining completed acts of discipline or adverse employment actions as discrete acts).

Southward also claims that in late February 2011, she was demoted from her position as Supervisor of Human Resources and transferred from the main office to School 28. That reassignment in February 2011 (assuming, as I must, that it was retaliatory) was discrete and actionable, and it triggered the one-year limitations period. *See Sgro v. Bloomberg L.P.*, No. 05-731, 2008 WL 918491, at *5-6 (D.N.J. Mar. 31, 2008), *aff'd in part, rev'd in part*, 331 F. App'x 932 (3d Cir. 2009) (holding that changing plaintiff's office assignment to an undesirable location is a discrete act and not subject to the continuing violation doctrine). The same analysis applies to Southward's final transfer on June 10, 2011, from Human Resources to the Food Services Department. *See Shepherd v. Hunterdon Developmental Ctr.*, 803 A.2d 611, 627 (N.J. 2002) (holding that an unwelcome transfer is a discrete act).

Accordingly, the Court finds that each retaliatory transfer or reduction in job functions alleged in Count 1 was a discrete act that was actionable at the time it occurred in 2010 or 2011. Those acts therefore do not carry forward into the limitations period (which began on June 2, 2014) under the continuing

violation doctrine. Southward's claims based on those actions in 2010–11 are untimely under CEPA's one year statute of limitations, and are dismissed.

Southward has also alleged other, miscellaneous acts of harassment in 2010–11. She alleges that she was (i) ostracized by her new co-workers when she began working in Food Services in June 2011 (AC ¶ 75); (ii) embarrassed by her Supervisor at a meeting in September 2011 (*id.* ¶¶ 81-85); and (iii) asked to pick up food for Board meetings (*id.* ¶¶ 87-88). These did not involve changes to her job duties or status, and are not independently actionable.[2] Such acts might nevertheless, in the aggregate and over time, add up to a pattern of retaliation. *See* Section III.A.i, *supra*. I will assume *arguendo* that these acts formed a continuous series in 2010–11, and that accrual of a CEPA claim might have been delayed until the occurrence of the last one in September 2011.

Nevertheless, I find inadequate the allegations that these acts were part of a continuing violation that extended into June 2014. The Complaint clearly lays out a series of acts by Southward in 2010–11, which she characterizes as a "hostile work environment" and might better be described as a retaliatory environment. The fact that these retaliatory acts (apparently) petered out in 2011 was not mere happenstance; as of June 2011, Southward was no longer in the Human Resources Department and no longer in a position to interfere with the Board's desired appointments and other actions.

---

[2]

> [N]ot every employment action that makes an employee unhappy constitutes " 'an actionable adverse action.' "[citing *Cokus v. Bristol Myers Squibb Co.*, 827 A.2d 1173, 1180 (N.J. Super. Ct. Law Div. 2002), *aff'd*, 827 A.2d 1098 (N.J. Super. Ct. App. Div.), *certif. denied*, 834 A.2d 405 (N.J. 2003)] (quoting *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir.1997)); *see also Hancock* [*v. Borough of Oaklyn*, 790 A.2d 186, 192–93 (N.J. Super. Ct. App. Div. 2002), *app. dismissed*, 827 A.2d 286 (2003)] (allegations of retaliatory conduct that made plaintiff's job "mildly unpleasant" and did not result in substantial impact on either plaintiff's working conditions or cause a de facto termination were insufficient to constitute unlawful retaliation).

*Nardello*, 873 A.2d at 581.

True, Southward then began speaking to law enforcement and continued to do so from some time in 2011 through 2013. Defendants did not learn of that, however, until 2013 at the earliest, and did not retaliate until well after that. Three years elapsed between the 2011 "hostile environment" actions and the next alleged act of retaliation, Southward's termination in June 2014. The Amended Complaint strongly implies that Southward's cooperation with law enforcement was the precipitating event. It alleges no facts tending to establish that the nondiscrete acts of harassment in 2010–11 were continuous with the events surrounding the June 2014 termination. Southward's claims of an ongoing CEPA violation, insofar as they arise from nondiscrete acts in 2010 and 2011, are therefore also dismissed on statute of limitations grounds.

I do not imply that the events of 2010–11 would not be admissible in evidence to prove some element of a CEPA claim based on the 2014 actions. On a theory of direct relevance, or perhaps on a Rule 404(b) theory, they might be. *See Roa,* 985 A.2d at 1237 (citing *Morgan,* 536 U.S. at 113, 122 S. Ct. at 2072). But as the source of an independent claim, those 2010–11 events are time-barred.

What remains of Count 1, then, is a CEPA claim asserted by Southward on the basis of the June 2014 acts of retaliation.

## 2. Notice-exhaustion requirement

Defendants argue that Count 1, to the extent it survives the statute of limitations analysis, should be dismissed because Southward failed to comply with CEPA's notice-exhaustion requirement.

The statute obligates a would-be whistleblower to first bring her complaints to the attention of the employer and afford the employer an opportunity to cure:

> The protection against retaliatory action provided by this act pertaining to disclosure to a public body shall not apply to an employee who makes a disclosure to a public body unless the employee has brought the activity, policy or practice in violation of a law, or a rule or regulation promulgated pursuant to law to the attention of a supervisor of the employee by written notice and has

afforded the employer a reasonable opportunity to correct the activity, policy or practice.

N.J. Stat. Ann. § § 34:19-4.

The statute carves out an exception to the notice requirement, however, where the matters disclosed are reasonably believed to be already known to persons at the supervisory level:

> Disclosure shall not be required where the employee is reasonably certain that the activity, policy or practice is known to one or more supervisors of the employer ….

*Id.* Southward invokes this exception, contending that supervisors not only knew of but perpetrated the acts of which she complained. (*See* Pl. Br. 21; AC ¶ 76). Defendants counter that Board members, teachers, and administrators are not the kind of supervisors who could set policy or remedy the acts of which Southward complained. (Def. Reply Br. 5).

On their face, these arguments concern matters of defense, as well as factual issues that are not suited for disposition on a motion to dismiss. The motion to dismiss Southward's Count 1 CEPA claim, insofar as it rests on failure to comply with CEPA's notice-exhaustion requirement, is therefore denied.

### 3. Liability of individual defendants

The individual defendants (as opposed to the Board) argue that Count 1 should be dismissed as against them, because it fails to allege specific facts as to what each individual did to retaliate against Southward. (Def. Br. 15) Southward replies that such concerns are "premature" and that the individual defendants' roles will emerge in discovery. (Pl. Br. 21, 24)

CEPA primarily imposes liability for retaliatory acts upon an "employer"—here, the Board. *See* N.J. Stat. Ann. § 34-19-3. The definition of an "employer," however, also includes a "person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent." N.J. Stat. Ann. § 34:19-2(a); *see also Bowen v. Parking Auth. of City of Camden*, No. 00-5765, 2003 WL 22145814, at *22 (D.N.J. Sept. 18, 2003).

Thus CEPA liability may attach to individuals who perform retaliatory acts with the authorization of their employers. *Ivan,* 595 F. Supp. 2d at 478. That liability, however, is not derivative; it requires personal involvement. CEPA "will not impose liability on any employee, supervisor, commissioner, or attorney *unless* the plaintiff proves that the defendant took an adverse employment action against him because of his whistle blowing." *Bowen,* 2003 WL 22145814, at *23 (emphasis in original). When *Bowen* says "the defendant," it means each *particular* defendant. To some degree, then, the individual defendants' CEPA-specific objection merges with the general proscription against "group pleading" in a complaint. *See also Brennan v. Palmieri,* No. 07-4364, 2008 WL 5233782, at *6 (D.N.J. Dec. 12, 2008) (requiring plaintiff "to aver factual allegations that, if accepted as true, could establish how each individual defendant was personally liable for a CEPA violation"). Nevertheless, I am sensitive to the fact that *Bowen* was a summary judgment case, and that a plaintiff cannot be expected to be privy to the inner workings of this network of Board members and their associates.

The central surviving allegation of retaliation in Count 1 surrounds Southward's dismissal in June 2014. The original complaint failed to specify who was responsible for firing Southward, although counsel indicated that such an allegation could be made. (*See* Tr. 30–31.)[3] Inexplicably, the Amended Complaint falls short of making such an explicit allegation.

Only an employer can fire an employee, however, and the Amended Complaint does allege that Southward was fired and that the Board was her employer. The Amended Complaint also at least implies that "rubber room"

---

[3]        THE COURT [Judge Salas]:  Yes. I mean are you claiming the defendants all met, is that your allegation that they met and that they voted to terminate her, wouldn't that be in the complaint?

        MR. RAYNES [plaintiffs' counsel]: I believe – yes. We could put that in the complaint, that they met.

        THE COURT: It is not in there.

(Tr. 31)

matters are within the discretion of the Board. *See, e.g.,* AC ¶¶ 99, 96. I am willing at this stage to indulge the commonsense inference that "the Board" cannot act except through its members, whether by a formal vote or informal consensus. A third possibility—the members' abdication of responsibility and acquiescence to the desires of behind-the-scenes actors—is raised, but I need not resolve that issue here.

Plaintiffs now belatedly state, in their opposition to Defendants' motion, that "members of the Board took action to remove Plaintiffs from their positions," and that the "Board in fact met to discuss the termination of Plaintiffs ('C.S.' and 'K.K.') and this is memorialized in the minutes of the June 12, 2014 Board meeting." (Pl. Br. 24). The publicly available portion of the minutes, available online, does confirm that a resolution of "administrative leave with pay" was approved unanimously as to "C.S." and "K.K." after a private session.[4] The minutes of the following meeting, on June 19, 2014, indicate that the Board went into private session for, *inter alia,* "discussion of personnel, specifically C.S."[5] Statements in briefs, of course, do not serve to amend a deficient complaint.[6] I can, however, draw plausible inferences and consider matters of public record. *See* Section II, *supra.*

At the complaint stage, it would be a sufficient allegation of individual liability under CEPA that the members of the Board met, discussed, and voted to terminate a plaintiff. *See Michel v. Mainland Reg'l Sch. Dist.,* No. 08-2238, 2009 WL 2391293, at *3 (D.N.J. July 30, 2009). If a Second Amended

---

[4] http://www.epsnj.org/files/_2VBVh_/d451a4a5677a31fd3745a49013852ec4/OFFICIAL_MINUTES__6-12-14.pdf at pp. 17, 18.

[5] http://www.epsnj.org/files/_2VBWy_/66b31b933050fd203745a49013852ec4/OFFICIAL_MINUTES__6-19-14_Special_Bd_Mtg.pdf at p. 5.

[6] *See, e.g., Pennsylvania ex. rel Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."); *Talley v. United States,* No. 11-1180, 2014 WL 282680, at *5 (D.N.J. Jan. 24, 2014) (holding that "a complaint cannot be amended through the brief of a party in opposition to a motion to dismiss").

21

Complaint is submitted, it might as well be revised to include such an allegation. I will not, however, dismiss Count 1 on this basis.

Once discovery has been had, Southward will be held to the requirement of demonstrating the kind of personal involvement that would render *each* individual defendant liable. *See Bowen, supra* (summary judgment analysis). The motion to dismiss is denied, however, as to Southward's Count 1 CEPA claim against the individual Board members.

## B. First Amendment and NJCRA (Counts 4, 5: Southward)

In Count 4, Southward asserts a claim of First Amendment retaliation under 42 U.S.C. § 1983.[7] In Count 5, Southward asserts a parallel claim under the analogous provisions of the State Constitution and the NJCRA.[8] For

---

[7]      Title 42, United States Code, Section 1983 reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

[8]      The relevant portion of the NJCRA reads:

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for other injunctive or other appropriate relief.

N.J. Stat. Ann. § 10:6-2(c).

The NJCRA was modeled on Section 1983, and New Jersey courts have consistently looked at claims under the NJCRA "through the lens of § 1983." The two are construed in parallel. *Ingram v. Twp. of Deptford*, 911 F. Supp. 2d 289, 298 (D.N.J. 2012); *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443-44 (D.N.J. 2011); *Chapman v. New Jersey*, 2009 WL 2634888, *3 (D.N.J. Aug. 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart...").

simplicity, I refer to Southward's Section 1983 and NJCRA claims in Counts 4 and 5 as her "First Amendment" claims. Defendants move to dismiss Southward's First Amendment claims on statute of limitations and substantive grounds.

Southward alleges that she engaged in protected First Amendment conduct, in the form of her maintaining certain "political views and affiliations" and "fail[ing] to contribute support and financial assistance to Defendants' preferred candidates and campaigns." (AC ¶ 173-79) She alleges that in response, she was (i) harassed in 2010 through 2011; (ii) transferred in or around February 2011 from her position as Supervisor of Human Resources to School 28, and to a Food Services position; and (iii) terminated in June 2014. (AC ¶¶ 162-79). Defendants argue that Southward's First Amendment claims are untimely under the applicable two-year statute of limitations and that the Amended Complaint fails to plead causation. (Def. Br. 18-19).

### 1. Statute of limitations

As to the statute of limitations, the analysis of the First Amendment claim is parallel to that under CEPA (*see* Section III.A.ii.1, *supra*), except that the relevant limitations period is two years, rather than one. That distinction makes no difference; the two year statute of limitations bars claims accruing before June 2, 2013, but the acts already found to be time-barred date from well before then, in 2010–11.

Actions brought under § 1983 are governed by the personal injury statute of limitations of the state in which the cause of action accrued. *O'Connor v. City of Newark*, 440 F.3d 125, 126 (3d Cir. 2006). For § 1983 actions in New Jersey, "that statute is N.J. Stat. Ann. § 2A:14–2, which provides that an action for injury to the person caused by a wrongful act, neglect, or default, must be convened within two years of accrual of the cause of action." *O'Connor*, 440 F.3d at 126–27. The statute of limitations for a parallel claim under the NJCRA is likewise two years. N.J. Stat. Ann. § 2A:14-2; *Borrello v. Elizabeth Bd. of Educ.*, No. CIV.A. 14-3687 JLL, 2014 WL

5392042, at *4 (D.N.J. Oct. 23, 2014) (citing *Brown v. City of Newark*, 2010 WL 1704748, at * 4 (D.N.J. Apr. 26, 2010)).

For purposes of the continuing violation analysis, both a federal and a state First Amendment retaliation claim are governed by the "discrete" vs. "nondiscrete" accrual doctrine of *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S. Ct. 2061 (2002). *See* discussion at Section III.A.ii.1, *supra*. Indeed, a retaliatory act is probably more likely to be held discrete and actionable under the First Amendment than under CEPA.

*Borrello, supra,* for example, was a First Amendment retaliation case brought against the Elizabeth Board of Education by a secretarial employee. The plaintiff, "Mary," alleged a range of adverse actions, ranging from administrative harassment, to banishment to the "rubber room," to the withholding of pay increases.[9] The Court, per Judge Linares, noted the "very low" threshold for First Amendment retaliation, and held that as a result, even fairly minor acts would be regarded as discrete and independently actionable:

> At issue here is whether Mary's retaliation claims, which allege that Defendants retaliated against Mary because she exercised her constitutional rights to freedom of speech and association, are based on discrete acts. The Court holds that they are in light of the Third Circuit's holding in *O'Connor*.
>
> In *O'Connor*, the Third Circuit held that a retaliatory act intended to punish a public employee for exercising her First Amendment rights is discrete and thus individually actionable "if under the circumstances it would be sufficient to 'deter a person of ordinary firmness' from exercising ... her First Amendment rights." *Id.* at 128 (quoting *Suppan v. Dadonna*, 203 F.3d 228, 234–35 (3d Cir.2000)). This "deterrence threshold," according to the Third Circuit, is "very low" since "a cause of action is supplied by all but truly *de minimis* violations." *Id.* (citing *Suppan*, 203 F.3d at 234–45).

*Borrello*, 2014 WL 5392042, at *5.

---

[9]    As it happened, the withholding of Mary's pay increase was allegedly communicated to her *via* a letter from Kulick's sister, Karen Murray, then the Board's Director of Human Resources.

I therefore hold that the continuing violation theory has, if anything, even less applicability here. As in the case of CEPA, First Amendment retaliation claims based on the defendants' 2010–11 actions are barred by the statute of limitations. First Amendment retaliation claims based on the actions surrounding Southward's June 2014 dismissal, however, are not time-barred.

## 2. Causation

What remains is a retaliation claim, where the acts of retaliation are those surrounding Southward's banishment to the "rubber room" and termination in June 2014. To plead a retaliation claim under the First Amendment, a plaintiff must allege "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006).

Count 4 alleges only that Southward did not always support Board causes or engage in Board-favored political activities. The time frame is 2010–11, and the act of retaliation alleged is the 2011 transfer/demotion. Those acts, however, are time-barred, as discussed above. This count does not plead a causal link flowing from Southward's political beliefs or affiliations, and in particular it does not plead any link to the only potentially timely act of retaliation, the June 2014 dismissal. Indeed, as to that 2014 dismissal, Southward's theory seems to be an entirely separate one: that Defendants dismissed her when they learned she had been speaking to the FBI. (*See* AC ¶¶ 89-93).

Although other allegations of the Complaint are incorporated by reference, I will not attempt to extract or hypothesize a theory on Southward's behalf. The motion to dismiss Counts 4 and 5 will therefore be granted, but without prejudice. Any proposed Second Amended Complaint must state what First Amendment speech or affiliations are at issue; what *non-time-barred*

adverse action was allegedly taken in response; and some factual basis to think there is a causal link between the two. The requirement is not that the allegations be longer or more numerous, but that they be specifically keyed to the requirements of a First Amendment cause of action.

Count 4 (and Count 5, insofar as it is asserted on behalf of Southward), are therefore dismissed. That dismissal is without prejudice to the submission, within 30 days, of a Second Amended Complaint that remedies the deficiencies noted above.

### 3. Other grounds

Because I have dismissed Southward's First Amendment claims, I do not reach certain other grounds asserted by the defendants. These include vicarious liability of the Board, the liability of the individual defendants, and the legislative immunity of the individual defendants. For the guidance of counsel in drafting an amended pleading as to Southward, I refer them to my discussion of those issues in relation to Kulick. *See* Section IV.B.2, *infra*.

## IV.   CLAIMS ASSERTED BY KULICK

### A. CEPA (Count 2)

Count 2 of the Amended Complaint alleges CEPA violations on behalf of plaintiff Kulick. Although the legal basis of the claim parallels that asserted by Southward, the facts are distinct. Kulick essentially alleges that she was dismissed because she complained (a) of a coworker's tardiness and intoxication, and (b) of failure to make merit payments to Directors (including herself) that were required by a memorandum agreement with the union.

A CEPA claim, recall, has four essential elements: (1) that Kulick reasonably believed the complained-of conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) that she performed a whistleblowing activity; (3) an adverse employment action; and (4) that the adverse employment action occurred because of her whistleblowing activity. *See* Section III.A.i, *supra*. Defendants assert that Count 2 should be dismissed because Kulick's allegations do not satisfy elements (1)

26

and (4)—*i.e.*, they do not involve violations of law or public policy, and they are not causally linked to Kulick's dismissal. In response, Kulick chiefly argues that discovery will reveal a basis for the claims.

I first consider Kulick's report of Gomes's tardiness and (sometimes) intoxication. CEPA protects employees who complain to employers about certain misconduct of co-workers. *Higgins v. Pascack Valley Hosp.*, 158 N.J. 404, 419 (1999); N.J. Stat. Ann. § 34:19-3c. But CEPA does not cover all work-related misconduct. A single co-worker's tardiness and occasional intoxication, without more, does not violate any criminal statute,[10] and Kulick identifies no statute or regulation that closely relates to the complained-of conduct. Nor has Kulick specified a clear mandate of public policy that "concern[s] the public health, safety or welfare or protection of the environment." N.J. Stat. Ann. § 34:19-3c(3). I will assume *arguendo* that it exists, but there is another problem.

Count 2 also fails to plead facts suggesting that CEPA element 4 (causation) is satisfied. That, to be sure, is ordinarily a factual issue. Here, however, Kulick alleges no facts suggesting that Kulick's 2014 termination was caused by her report of her co-worker Gomes's conduct in 2010. Kulick's sister, Karen Murray, allegedly was terminated at around that time for objecting to Gomes's promotion. Kulick detected a menacing undertone in the statement of defendant Goncalves that Murray's dismissal did not need to affect Kulick. But Kulick does not allege that she herself was then subjected to any adverse action at all. Of course circumstances, such as temporal proximity, may permit a fact finder to infer causation. Here, however, nearly four years went by before Kulick was terminated in 2014. That is not enough to plausibly suggest an inference of causation. For these reasons, I dismiss Kulick's CEPA claim arising from her disclosure of Gomes's conduct. The

---

[10]    For what it is worth, New Jersey explicitly prohibits counties, municipalities, or other political subdivisions of the State from "adopt[ing] any law, ordinance, bylaw, resolution or regulation having the force of law [] rendering public intoxication or being found in any place in an intoxicated condition an offense, a violation or the subject of criminal or civil penalties or sanctions of any kind." N.J. Stat. Ann. § 26:2B-26.

dismissal is without prejudice, however, to an amended complaint that states facts in support of an inference of causation.

I move to the second component of Kulick's CEPA claim: her allegation that she was fired because she complained that Board insiders received agreed-to merit raises, but that the Directors did not. Once again, Kulick's complaint fails to identify the claimed "law, rule or regulation" or contravention of public policy. Certainly in the context of private employment, adjustment of rights as between employer and employee is not a public matter covered by CEPA.[11] The context here is public employment, which is different. Nevertheless, the complaint "that the Directors had never received their Merit Pay" (AC ¶ 115) on its face is a salary dispute between a small class of employees and their employer. It does not self-evidently implicate a public harm; at any rate, the complaint does not identify the particular rule or public policy involved, and I will not guess. For these reasons, I also dismiss this second component of Count 2, arising from Kulick's complaint regarding lack of merit pay.

I do not say that a CEPA claim could not be pled. Any amended complaint, however, must factually set forth the elements of a claim, and idenfity the *specific* statute, regulation, or public policy allegedly contravened by these alleged acts, under the principles discussed at pp. 10–11, *supra*.

In sum, Count 2, asserted by Kulick, is dismissed in its entirety. It does not appear, however, that amendment would necessarily be futile. This dismissal is therefore without prejudice to the submission within 30 days of a Second Amended Complaint that remedies the deficiencies identified above.

---

[11]     *Cf. Smith v. TA Operating LLC*, No. 10-2563, 2010 WL 3269980, at *4-5 (D.N.J. Aug. 17, 2010) (stating that company policies or contractual agreements "do not constitute law, rule or regulation as required by the language of CEPA"). Moreover, CEPA requires that "the offensive activity must pose a threat of public harm, not merely private harm or harm only to the aggrieved employee." *Mehlman v. Mobil Oil Corp.*, 707 A.2d 1000, 1013 (N.J. 1998); *see also Competello v. LaBruno*, No. 02-664, 2005 WL 1637907, at *8 (D.N.J. July 12, 2005) (requiring that "the complained-of conduct have 'public ramifications' in order to be protected under CEPA").

**B.     First Amendment and NJCRA (Counts 3, 5: Kulick)**

**1. Liability of individual defendants**

Defendants argue that Kulick's First Amendment claims under § 1983 and NJCRA "should be dismissed because Plaintiffs have failed to plead that any individual defendant personally engaged in retaliatory acts against them." (Def. Br. 22-24; *see also* Def. Reply Br. 10-11). Kulick replies essentially that the individuals' personal involvement must be developed in discovery. (Pl. Br. 33).[12]

A defendant in a civil rights action "must have personal involvement in the alleged wrongs to be liable," and "cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007). To establish personal liability under § 1983, a plaintiff must show that a defendant (i) "participated in violating" the plaintiff's rights; (ii) "directed others to violate" the plaintiff's rights; or (iii) as a supervisor, "had knowledge of and acquiesced in his subordinates' violations." *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-91 (3d Cir. 1995).

My reasoning here is parallel to the discussion of the same issue under CEPA. *See* Section III.A.ii.3, *supra*. It is true that Kulick really singles out only three individuals, Fajardo, Goncalves, and Ocasio, and omits an explicit allegation that the Board voted to fire her. As above, however, I note that the Board, as employer, was directly responsible for firing, and inferably could do so only by vote or consensus. That inference is supported by matters of public record, *i.e.*, the minutes of the June 2014 Board meetings.

As in the case of CEPA, I suggest that the complaint, if amended, should incorporate allegations of Board members' individual involvement in the

---

[12]     As noted above, this point is asserted against Southward as well, but Southward's First Amendment claims were dismissed on other grounds. Should Southward reassert them in amended form, this discussion may apply to them as well.

Defendants do not, as in the case of Southward, assert the statute of limitations as to Kulick's First Amendment claim.

termination. I will not, however, dismiss Kulick's First Amendment claims in Counts 3 and 5 on this basis.

### 2. Other grounds

Regarding the liability of the Board as an entity, Defendants assert correctly that under *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S. Ct. 2018 (1978), there is no *respondeat superior* liability under Section 1983. The weight of authority interprets the NJCRA in the same manner. *See Harvey v. Cty. of Hudson*, No. CV 14-3670 (KM), 2015 WL 9687862, at *11 (D.N.J. Nov. 25, 2015); *Ingram v. Twp. Of Deptford*, 911 F. Supp. 2d 289, 298 (D.N.J. 2012)). The complaint does allege sufficiently, however, that there was a longstanding practice of coercing employees into political activities and punishing them for refusing to cooperate with improper decisions. The practice is alleged to involve, not just underlings, but members of the Board itself. Such an allegation remains to be proven, of course, but as an allegation it is sufficient.

I would also rule that the individual Board members' legislative immunity involves questions of fact not suitable for resolution on a motion to dismiss. Among other things, it must be determined whether the Board was truly legislating for the school district, or whether it was acting in an administrative capacity, making personnel decisions directed to an individual employee. *See generally In re Montgomery County,* 215 F.3d 367, 377 (3d Cir. 2000). The motion to dismiss on these grounds is denied without prejudice to renewal of these immunity contentions in connection with summary judgment.

### V.   NEW JERSEY CIVIL RICO

In Count 6 of their Amended Complaint, Southward and Kulick jointly assert a claim under NJRICO, alleging that Defendants conducted the affairs of the Board through a pattern of racketeering activity. (AC ¶¶ 180-90). I find that Count 6 does not meet the *Twombly/Iqbal* standard of factual pleading.[13]

Pursuant to NJRICO, it is unlawful to be "employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." N.J. Stat. Ann. § 2C:41–2(c). The elements of a claim under NJRICO are "(1) the existence of an enterprise; (2) that the enterprise engaged in activities that affected trade or commerce; (3) that the defendant was employed by or associated with the enterprise; (4) that the defendant participated in the conduct of the affairs of the enterprise; (5) that the defendant participated through a pattern of racketeering activity; and (6) that the plaintiff was injured as a result of the conspiracy." *Galicki v. New Jersey*, No. 14-169, 2015 WL 3970297, at *7 (D.N.J. June 29, 2015).[14]

---

[13]    Plaintiffs have voluntarily dismissed their federal RICO claims pursuant to 18 U.S.C. § 1962. (*See* Pl. Br. 40. The reference to federal RICO in the Amended Complaint's jurisdictional statement seems to be a vestige.) The NJRICO statute, however, has been interpreted in conformity with the federal RICO statute, and I cite federal case law as a guide. *See In re Schering–Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 245 (3d Cir. 2012) ("Since the TPP Complaint's federal and New Jersey RICO claims parallel each other, and because the two RICO statutes are intended to be coextensive, we follow the District Court's approach and analyze the two claims concurrently."); *State v. Cagno*, 211 N.J. 488, 508 (2012) ("[B]ecause our New Jersey RICO statute is modeled upon its federal counterpart, it is appropriate to accept guidance from the federal RICO cases.").

[14]    Defendants, citing *Galicki*, state that a NJRICO claim is subject to the heightened pleading requirements for fraud claims under Federal Rule of Civil Procedure 9(b). For that proposition, *Galicki* cites *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004) (*abrogated in part on other grounds by Twombly, supra*). *Lum*, however, involved a RICO claim that was predicated on fraud offenses. I am not persuaded that *Galicki* meant to imply that all NJRICO claims, regardless of their nature, are subject to Rule 9(b) pleading standards.

The NJRICO allegations of this Amended Complaint are so general and conclusory that they fail to provide each Defendant with notice of his or her alleged participation in the racketeering enterprise. *See, e.g., id.* at *8 (dismissing plaintiffs' NJRICO claim for "failing to provide each Defendant with notice of its alleged participation in the racketeering enterprise"). I have indulged the plaintiffs in regard to specifying each individual defendant's involvement in the CEPA and First Amendment claims, *supra*. As to NJRICO, however, that indulgence is stretched past the breaking point. Here, each defendant's participation cannot be inferred from employer status and is not just a generic prerequisite for liability; rather, it is woven into the substantive elements of NJRICO.

Count 6 alleges generally that the Board is an enterprise, of which the individual defendants are members or affiliates. (AC ¶¶ 181–83) Without names, dates, or particulars, it alleges that the "Defendants" as a group participated in the affairs of the Board through a "pattern of racketeering activities, including bribery." (AC ¶ 184) The bribery allegedly consisted of soliciting political contributions "in exchange for favors and continued employment over a period of several years," including the creation of an "understanding among Board employees that Defendants could influence employment matters." (AC ¶ 185)

As to this NJRICO claim, the who, what, when, where, and how are largely absent. This is all simply too vague and conclusory to meet the *Twombly/Iqbal* pleading standards. Indeed, even if I comb the allegations of the other counts, I cannot extract the necessary allegations. The most specific seem to involve defendant Fajardo (at times acting as a private citizen and at other times as a Board member). (*See* AC ¶¶ 136-37) Despite being given one prior opportunity to amend, the Plaintiffs have not alleged *factually* that any other Defendant did anything that would approach the criminal offense of bribery. The only person other than Fajardo who is alleged to have solicited

political contributions is Annie Rooney, Defendant Munoz's secretary, who is not named as a defendant. (*Id.* ¶¶ 128-29).

NJRICO is a complex statute which, by its very nature, necessitates a certain level of specificity in pleading. By dropping their federal RICO claim, the plaintiffs have avoided the necessity of submitting a federal RICO case statement setting forth the basis of their claims in detail. *See* Loc. Civ. R. App'x N. Should plaintiffs attempt to amend their NJRICO claim, however, Appendix N may provide a useful guide to the kind of allegations required to set forth a claim. To be clear, I do not imply that plaintiffs must or should amend their claim; nor do I mean to convey that Appendix N sets forth a standard for pleading a NJRICO action that displaces the standards of the Federal Rules.

I will therefore grant Defendants' motion to dismiss Count 6, the Civil NJRICO claim, without prejudice.

## V.   CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss is granted in part and denied in part. As to Count 1 (CEPA/Southward) the motion to dismiss is granted in part, based on the statute of limitations, as to acts of retaliation occurring before June 2, 2014. As to Counts 4 and 5 (First Amendment retaliation/Southward) the motion to dismiss is granted. As to Count 2 (CEPA/Kulick) the motion to dismiss is granted on both statute of limitations and substantive grounds. As to Counts 3 and 5 (First Amendment retaliation/Kulick), the motion to dismiss is denied. As to Count 6 (NJRICO) the motion to dismiss is granted.

All dismissals, except those under the statute of limitations, are without prejudice to the submission, within 30 days, of a proposed Second Amended Complaint that remedies the deficiencies identified above in this Opinion.

Dated: January 11, 2017

KEVIN MCNULTY
United States District Judge