## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

CARMEN SOUTHWARD and KRISTIN
KULICK,
                    Plaintiffs,

          v.

ELIZABETH BOARD OF EDUCATION,
OLGA HUGELMEYER, individually
and in her official capacity as
Superintendent, PABLO MUNOZ,
individually and in his official
capacity as former Superintendent,
HAROLD KENNEDY, JR., individually
and in his official capacity as Board
Secretary, DONALD GONCALVES,
individually and in his official
capacity as Assistant Board
Secretary, RAFAEL FAJARDO,
individually and in his official
capacity as board member,
FRANCISCO GONZALES, individually
and in his capacity as board member,
PAUL PEREIRA, individually and in
his capacity as board member,
CARLOS TRUJILLO, individually and
in his capacity as board member,
ELCY CASTILLO-OSPINA,
individually and in her capacity as
board member, TONY MONTEIRO,
individually and in his capacity as
board member, OSCAR OCASIO,
individually and in his official
capacity as Director of Process
Improvement, and JOHN DOES 1-10,

                    Defendants.

Civ. No. 15-3699 (KM)


OPINION

**MCNULTY, District Judge:**

This matter comes before the Court upon defendants' motion (ECF no. 52)[1] to dismiss the second amended complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the motion is GRANTED in part, and DENIED in part.

## I. Background

This complaint joins together the claims of two employees of the Elizabeth public school system who were dismissed in June 2014. Their supporting facts are summarized separately.[2]

### A. Southward's Factual Allegations

Plaintiff Carmen Southward was first employed by defendant Elizabeth Board of Education (the "Board") in 2006 as a world language teacher. (2AC ¶ 22). In July 2008, she was transferred to the Human Resources Department, where she worked as a staffing assistant. (*Id.* ¶ 24). In July 2009, she was promoted to Interim Supervisor for Recruitment and Hiring. (*Id.* ¶ 26). In December 2009, she was appointed as the District's Affirmative Action Officer, a position that was added to her existing responsibilities. (*Id.* ¶ 27).

Southward claims that in 2010 and 2011, during her time as a supervisor in the Human Resources Department, she reported misconduct by Director of Education Daphne Marchetti. Her alleged whistleblowing consisted of reporting that Marchetti did not possess the required state certifications to

---

[1] Citations to the record are abbreviated as follows:

    1AC = First Amended Complaint (ECF no. 26)

    2AC = Second Amended Complaint (ECF no. 49)

    Def. Br. = Brief in Support of Defendants' Motion to Dismiss (ECF no. 52)

    Pl. Br. = Brief in Opposition of Defendants' Motion to Dismiss (ECF no. 56)

[2] I take the factual allegations of the complaint as true for purposes of resolving a motion to dismiss. *See* Section II, *infra*, and cases cited.

work as either a teacher or an administrator (*Id.* ¶¶ 28-30); that Marchetti had a secretary in the Human Resources Department reload all of her vacation days back into the system (*Id.* ¶¶ 34-35); and that Marchetti allegedly forged documents that extended her maternity leave. (*Id.* ¶ 46). During this 2010–11 period, Southward also objected to defendant Rafael Fajardo's request to hand out political pins at interviews of new candidates (*Id.* ¶ 48); refused to approve the hiring of a Board-backed, non-tenured candidate because there were other tenured candidates on the hire list (*Id.* ¶ 42); and refused to alter employment paperwork for Fajardo. (*Id.* ¶¶ 49-51).

Southward alleges that her whistleblowing, defined to include refusal to cooperate with improper conduct, led to retaliation. In 2010 and 2011, (i) defendant Pablo Munoz, who was then the Superintendent, told her to stop reporting about teacher-credential issues and undermined her job functions by limiting her ability to recommend personnel actions related to transfers, new hires, and non-renewals (*Id.* ¶¶ 37-38); (ii) defendant Donald Goncalves contacted her at home to warn her that things would get "ugly" because she had reported Marchetti's violations (*Id.* ¶ 59); and (iii) defendants Fajardo and Munoz pulled Southward's boss into a car to discuss their suspicion that Southward had gone to the FBI. (*Id.* ¶ 53). Fajardo and Munoz said they planned to transfer Southward until she was miserable and then fire her so "she wouldn't have a claim." (*Id.*). Also during this period, (iv) Munoz asked, during a cabinet meeting, if anyone wanted to address the serious concerns with Southward's handling of the vacancies in Elizabeth's schools (*i.e.*, Southward's refusal to hire the Board members' preferred candidates) (*Id.* ¶¶ 54-56); (v) Southward received a written letter of reprimand related to the vacancy issues raised at the meeting (*Id.* ¶ 57); (vi) Southward received, for the first time, a negative performance evaluation from her supervisor (*Id.* ¶ 67); (vii) in February 2011 Southward was demoted from her position as Supervisor of Human Resources and transferred from the main office to School 28 (*Id.* ¶¶ 60-62); (viii) Goncalves met with Southward again and told her there is "still

going to be a place for you as long as you let some things go" and "be careful" (*Id.* ¶¶ 63-66); and (vix) in June 2011 she was transferred out of Human Resources to the Food Services Department. (*Id.* ¶¶ 76-78).

In her new position as Interim Supervisor of Food Services, she learned that some board members, teachers, and administrators were receiving free meals from the federal school lunch program, thus diverting resources meant to help feed low-income students. (*Id.* ¶ 78). In the summer of 2011, Southward reported the abuse of the federal school lunch program to the Union County Prosecutor, the New Jersey Office of the Attorney General, and the Federal Bureau of Investigation ("FBI"). (*Id.* ¶ 80). She met with law enforcement officials through the rest of 2011, 2012, and 2013, and reported additional violations of the Board's personnel policies and the use of paid time for political activities. (*Id.* ¶ 90).

In July 2013, Southward heard secondhand that the defendants were aware she had been speaking to the FBI. (*Id.* ¶ 91). In April 2014, Southward was notified that Fajardo had obtained a copy of notes from her FBI interview. (*Id.* ¶ 93). She was told by Fajardo's political consultant and her boss that the Board was "furious" that she had communicated with the FBI. (*Id.* ¶ 94).

Additionally, "throughout the course of her employment," Southward was pressured to engage in political activities. (*Id.* ¶ 225). She was "subjected to demands for financial contributions to the political campaigns of Defendant Board Members through the required purchase of tickets to political fundraising events." (*Id.*). Defendant Trujillo also "pressured" her to participate in phone banks for campaigns. (*Id.* ¶ 226). Southward "made contributions of time and money to Defendant Board Members' political campaigns because it was threatened that she would be terminated if she didn't." (*Id.* ¶¶ 227, 269).

On June 12, 2014, the Board met and unanimously approved administrative leave with pay for Southward. (*Id.* ¶ 102). She was notified the next day that she would be terminated effective June 30, 2014. (*Id.* ¶ 103). At

4

the Board's June 19, 2014 meeting, the Board voted officially to terminate Southward's employment. (*Id.* ¶ 104). For the two weeks remaining in her employment, Southward was sent to what was colloquially known as the "rubber room," where she remained in "isolation" without a phone or computer. (*Id.* ¶¶ 110-12).

### B. Kulick's Factual Allegations

Plaintiff Kristin Kulick was the Board's Director of Special Projects beginning in August 2009. (*Id.* ¶ 122). First, she objected to several issues about the Communications Department. Kulick reports that there were four to six employees who worked solely on public-relations tasks for the Board in violation of the district's accountability regulations. (*Id.* ¶¶ 124-25). When Kulick received a voicemail asking about the communications department, defendant Goncalves insisted she not tell the person that there even was a Communications Department; he reminded her that the records showed that these employees worked in other departments. (*Id.* ¶ 137).

Ms. Kulick also objected to defendant Goncalves that administrative publications were not sent periodically, but were sent in "multiple blasts inappropriately timed with the election cycle." (*Id.* ¶ 136). She also objected that Goncalves required that only pictures of Board members be on the front page of the publications. (*Id.* ¶ 136).

In the spring of 2010, Kulick raised concerns that her co-worker Amy Gomes, the fiancée of defendant Tony Monteiro, was arriving to work late and sometimes visibly intoxicated. (*Id.* ¶ 127). Kulick informed Karen Murray, then the Director of Human Resources (who happens to be Kulick's sister), about Gomes's conduct. (*Id.* ¶¶ 129-31). Murray raised concerns about promoting Gomes, after which Murray was placed on administrative leave and was ultimately terminated. (*Id.* ¶ 130). Afterward, defendant Goncalves told Kulick that her sister's termination "doesn't have to affect you, unless you want it to." (*Id.* ¶ 131). Kulick interpreted this as a threat. (*Id.*).

In May 2013, Kulick was told to purchase tickets at a fundraiser for hundreds of dollars. (*Id.* ¶ 132). She objected that "this was done as a direct threat [and] that her job was tied to her contribution." (*Id.*). In 2013 and 2014, Ms. Kulick refused to buy tickets for politically connected charity events. (*Id.* ¶ 133). "Throughout her employment, including in 2014, Ms. Kulick was continually required to make significant financial contributions to the political campaigns of Defendant Board Members." (*Id.* ¶ 134). Ms. Kulick then refused to contribute time or money to Board-backed campaigns. (*Id.* ¶ 135).

Kulick also objected to defendant Oscar Ocasio's employment with the Board. She claims that Ocasio was given "a job with no responsibilities" so he would get paid for full-time political work. (*Id.* ¶¶ 138-42). Ocasio also began "showing up at Ms. Kulick's meetings," "leading meetings that were [Ms. Kulick's responsibility]," and took over her responsibilities with implementing a new security system for the schools. (*Id.* ¶¶ 141-43).

In spring 2014, at a Director's Association union meeting, Kulick raised concerns that she and other Directors had not received the merit pay to which they were entitled under a 2012 Memorandum of Agreement. (*Id.* ¶ 144). Defendant Ocasio told Kulick that he knew of an impending Human Resources and cabinet staff meeting at which certain individuals were slated to be "let go." (*Id.* ¶ 145). He warned Kulick that "she shouldn't be asking questions like that at th[is] time." (*Id.*). Nevertheless, Kulick submitted a written request to defendant Munoz that the Directors receive their merit pay. (*Id.* ¶ 150). Kulick asserts that her employment was terminated in June 2014 in retaliation for these activities. (*Id.* ¶¶ 151-52).

Kulick also asserts that she was punished for refusing to participate in political activities. In support, she alleges that shortly after she was hired in 2009, Annie Rooney, defendant Munoz's secretary, informed her that she was expected to purchase tickets to the Board members' political fundraisers and events. (*Id.* ¶¶ 172-73). Out of fear, Kulick purchased tickets. (*Id.* ¶¶ 174-75).

Kulick alleges that she was harassed and forced to contribute time and money to political campaigns, and that for a time she acquiesced. (*Id.* ¶¶ 176-80, 276). Specifically, Kulick alleges that she was "verbally intimidated and threatened" by defendant Fajardo, who (although not a Board member at the time) allegedly controlled new hires and ran many of the Board members' political campaigns from his private business office. (*Id.* ¶¶ 180-85, 281). Fajardo also left threatening voice messages to induce her to contribute more to the campaigns of Board members. (*Id.* ¶¶ 188-91, 278). After Kulick refused to purchase expensive tickets for a fundraiser, defendant Goncalves told her during a June 2013 performance review that "none of us are safe." She perceived this statement as a threat to her job. (*Id.* ¶¶ 198-99).

In September 2013, a Board-backed campaign led to the creation of a non-profit charity, to which Kulick refused to contribute. (*Id.* ¶¶ 200-01). In January 2014, Goncalves sent Ocasio to monitor Kulick's meetings, with the intent of intimidating her into changing her stance on fundraising issues. (*Id.* ¶¶ 202, 275). In May 2014, Kulick was told to pressure two school principals to encourage their teachers and students to attend the Elizabeth Cuban Day parade. (*Id.* ¶ 205). After a low turnout at the parade, Kulick was reprimanded and harassed. (*Id.* ¶¶ 206-07). Thereafter, Kulick altogether stopped contributing her time and money to Board-backed campaigns. (*Id.* ¶ 209). In June 2014, Kulick was terminated from her position and replaced by Ocasio, who was politically connected but had qualifications inferior to those of Kulick. (*Id.* ¶¶ 210-14).

### C. Procedural History

Plaintiffs initiated this action on June 2, 2015 (ECF no. 1). Jurisdiction is premised on 28 U.S.C. §§ 1331 (federal question), 1343(3) (federal civil rights claims), and 1367 (ancillary jurisdiction over state law claims). On August 14, 2015, defendants moved to dismiss plaintiffs' original complaint under Federal Rule of Civil Procedure 12(b)(6). (ECF no. 6). The Honorable Esther Salas,

U.S.D.J., held oral argument on March 22, 2016, and stated reasons on the record for her decision to dismiss the original complaint. (ECF no. 23). The following day, Judge Salas entered an order granting Defendants' motion to dismiss the complaint without prejudice to the filing of an amended complaint within 30 days. (ECF No. 24).

On April 21, 2016, the plaintiffs filed the first amended complaint. (ECF No. 26). The causes of action pled in the first amended complaint were:

Count 1: New Jersey Conscientious Employee Protection Act ("CEPA") (Southward);

Count 2: CEPA (Kulick)

Count 3: 42 U.S.C. § 1983/First Amendment retaliation (Kulick)

Count 4: 42 U.S.C. § 1983/First Amendment retaliation (Southward)

Count 5: New Jersey Civil Rights Act ("NJCRA") (both plaintiffs)

Count 6: New Jersey Racketeer Influenced and Corrupt Organization Statute ("NJRICO") (both plaintiffs).

On May 20, 2016, defendants filed a motion to dismiss the first amended complaint under Rule 12(b)(6). (ECF No. 29-1). After the motion to dismiss was fully briefed, it was administratively terminated pending reassignment. (ECF no. 42). On January 5, 2017, the case was formally reassigned from Judge Salas to me. (ECF no. 45). I reinstated the motion to dismiss and reviewed the matter afresh, and decided the defendants' motion.

Count 1 was dismissed regarding acts of retaliation before June 2, 2014 based on the statute of limitations. Counts 2, 4, and 6 were dismissed. Count 3 survived the motion to dismiss. Southward's Count 5 claim was dismissed, but Kulick's Count 5 claim survived. *Southward v. Elizabeth Bd. of Educ.*, No. 15-3699, 2017 WL 111924 (D.N.J. January 11, 2017); (ECF nos. 46-48).

On February 10, 2017, plaintiffs filed a second amended complaint. (2AC, ECF no. 49). It amends and supplements the allegations, although the causes of action in the six counts remain broadly the same. On March 17, 2017, defendants filed a motion to dismiss. (ECF no. 52). Plaintiffs filed a brief in opposition of the motion to dismiss on April 25, 2017. (ECF no. 57). Defendants submitted a reply brief on April 28, 2017. (ECF no. 58).

## II.    Legal Standards on Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss under Rule 12(b)(6), a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a

9

'probability requirement' ... it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

The United States Court of Appeals for the Third Circuit has explicated the *Twombly/Iqbal* standard on several occasions. *See, e.g., Argueta v. U.S. Immigration & Customs Enforcement*, 643 F.3d 60, 70-73 (3d Cir. 2011); *Santiago v. Warminster Twp.*, 629 F.3d 121, 129-30 (3d Cir. 2010). In doing so, it has provided a three-step process for evaluating a Rule 12(b)(6) motion:

> To determine whether a complaint meets the pleading standard, our analysis unfolds in three steps. First, we outline the elements a plaintiff must plead to a state a claim for relief. *See* [*Iqbal*, 556 U.S.] at 675; *Argueta*, 643 F.3d at 73. Next, we peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. Finally, we look for well-pled factual allegations, assume their veracity, and then "determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. This last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

*Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

"In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); *see also In re Asbestos Products Liability Litigation (No. VI)*, 822 F.3d 125, 134 & n.7 (3d Cir. 2016); *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case.").

### III. Claims Asserted by Southward
#### A. CEPA (Count 1)

Count 1, asserted by plaintiff Southward, brings a retaliation claim under the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J. Stat. Ann. § 34:19-1 *et seq.* Southward's allegations of retaliatory acts in Count 1 fall into two distinct categories: (i) in 2010 and 2011, during her time as Supervisor of Human Resources, she was subjected to harassment and unwanted transfers (in retaliation for raising complaints related to personnel policies and hiring preferences); and (ii) from June 13–30, 2014, she was sent to the "rubber room" and ultimately discharged (in retaliation for providing information to law enforcement).

This action was filed on June 2, 2015. As I explained in my earlier opinion on the motion to dismiss the first amended complaint, Southward's Count 1 claims regarding acts of retaliation that occurred before June 2, 2014 are barred based on CEPA's one-year statute of limitations. *Southward*, 2017 WL 111924, at *4-9. Those based on later acts, including Southward's termination in mid-June, 2014, are not barred. Defendants have not moved to dismiss Southward's timely Count 1 claims.

#### B. First Amendment and NJCRA (Counts 4, 5)

In Count 4, Southward asserts a claim of First Amendment retaliation under 42 U.S.C. § 1983.[3] In Count 5, Southward asserts a parallel claim under

---

[3] Title 42, United States Code, Section 1983 reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

the analogous provisions of the New Jersey Constitution and the NJCRA.[4] As before, for simplicity I refer to Southward's Section 1983 and NJCRA claims in Counts 4 and 5 as her "First Amendment" claims. On the motion to dismiss the first amended complaint, Southward's First Amendment claims were dismissed. *Southward*, 2017 WL 111924, at *11-13.

In the second amended complaint, Southward's First Amendment claims have been supplemented, primarily by a claim of retaliatory discharge. Defendants again move to dismiss Southward's First Amendment claims on statute of limitations and substantive grounds.

Southward now alleges that she engaged in protected First Amendment conduct by "not always support[ing] the Board-backed political causes or candidates or favored friends of the Board." (2AC ¶ 219). She asserts that she was "intimidated" into purchasing tickets for political fundraising events "because her continued employment was dependent on her making contributions." (*Id.* ¶¶ 225, 227). Eventually, Southward stopped supporting political organizations with her time and finances. (*Id.* ¶ 231). As a result of these actions, she was (i) transferred in around February 2011 from her

---

[4] The relevant portion of the NJCRA reads:

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for other injunctive or other appropriate relief.

N.J. Stat. Ann. § 10:6-2(c).

The NJCRA was modeled on Section 1983, and New Jersey courts have consistently looked at claims under the NJCRA "through the lens of § 1983"; the two are construed in parallel. *Ingram v. Twp. of Deptford*, 911 F. Supp. 2d 289, 298 (D.N.J. 2012); *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443-44 (D.N.J. 2011); *Chapman v. New Jersey*, 2009 WL 2634888, at *3 (D.N.J. Aug. 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart....").

position as Supervisor of Human Resources to a position with less authority (*Id.* ¶ 223); and (ii) terminated in June 2014. (*Id.* ¶¶ 102-04).

Defendants argue that Southward's "newly asserted" claim for retaliatory discharge is untimely under the applicable two-year statute of limitations. They add that her First Amendment claims are vaguely alleged, and fail to establish a causal nexus between events in 2010–11 and her discharge in 2014. (Def. Br. 9–10). I conclude that, to the extent they are timely, Southward's First Amendment claims fail to meet the plausibility standard of *Twombly/Iqbal*.

### 1. Statute of limitations

A two-year statute of limitations bars Southward's First Amendment claims insofar as they accrued before June 2, 2013. *See Southward*, 2017 WL 111924, at *12-13. I will not repeat the discussion in the earlier opinion except to state that it applies equally to a retaliation claim, insofar as it is based on Southward's 2010–11 demotion. *Id.*

By contrast, however, Southward's First Amendment retaliation claims, insofar as they are based on her June 2014 dismissal, are not time-barred. This action was filed in June 2015, well within two years of that dismissal.[5] The remainder of the discussion concerns the claim in relation to retaliatory acts surrounding Southward's June 2014 dismissal.

### 2. Individual liability

Regarding her First Amendment claims, Southward fails to allege specific actions of individual defendants. Pleading the personal involvement of each defendant is necessary in a civil rights action. A defendant in a civil rights

---

[5]    Here, as in the case of the CEPA claims, defendants argue that the relevant date of filing is not the date of the original complaint, but the date of the second amended complaint, which was not filed until February 10, 2017. The new allegations in Counts 4 and 5, they say, do not relate back to the date of the original complaint or the first amended complaint. Because I have dismissed Southward's First Amendment claims on substantive grounds, *see infra*, I do not reach that issue. *See generally Glover v. FDIC*, 698 F.3d 139, 145-46 (3d Cir. 2012).

action "must have personal involvement in the alleged wrongs to be liable," and "cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) (citations omitted). To establish personal liability under Section 1983, a plaintiff must show that a defendant (i) "participated in violating" the plaintiff's rights; (ii) "directed others to violate" the plaintiff's rights; or, (iii) as a supervisor, "had knowledge of and acquiesced in [his or her] subordinates' violations." *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-91 (3d Cir. 1995).

That requirement of alleging personal involvement interlocks with the *Twombly/Iqbal* requirement that a claim as pled must be "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That standard is met only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

Here, in Counts 4 and 5, Southward does not allege factual content suggesting that individual defendants violated her First Amendment rights or retaliated against her for exercising her First Amendment rights. Southward has set forth several conclusory allegations, but they are not supported by factual content. In her non-time barred allegations, Southward asserts that she "did not always support the Board-backed political causes or candidates or favored friends of the Board" and, as a result, was "harassed and subjected to a hostile work environment." (2AC ¶ 219). She purportedly was "subjected to demands for financial contributions to the political campaigns for Defendant Board Members through the required purchase of tickets to political fundraising events." (*Id.* ¶ 225). She claims "her continued employment was dependent on her making contributions." (*Id.* ¶¶ 225, 227). But these allegations do not provide defendants with individual notice of Southward's legal claims. The most specific allegation Southward makes—in which the relevant defendant is at least identified—is that defendant Trujillo "pressured Ms. Southward to participate in phone banks for the Board Member

Defendants' campaigns." (*Id.* ¶¶ 222, 226). This allegation alone, without any further specific facts, does not adequately allege a First Amendment violation.

### 3. Causal nexus

Because earlier acts of retaliation are time-barred, Southward must establish a causal nexus between her exercise of First Amendment rights and her retaliatory dismissal in June 2014. The trouble is that the only acts adequately alleged—*i.e.*, attributed to a particular defendant and described factually—date from 2010–11. The second amended complaint fails to allege plausibly that there is a causal nexus between the 2010–11 acts and the 2014 dismissal.

To plead a retaliation claim under the First Amendment, a plaintiff must allege "a causal link between constitutionally protected conduct and the retaliatory action." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006). Southward does not adequately plead facts that suggest a link between the only potential timely act of retaliation, the June 2014 dismissal, and Southward's exercise of First Amendment rights. Moreover, the temporal distance between 2010–11 and 2014 does not suggest that Southward's dismissal was retaliation for First Amendment activities. Indeed, Southward's theory is that the Board retaliated against her for whistleblowing. For this additional reason, Counts 4 and 5 fail to plead a First Amendment claim on behalf of Southward.

Overall, Southward's allegations in Counts 4 and 5 do not meet the *Twombly/Iqbal* standard. The second amended complaint does not provide any (a) non-time barred, (b) specific facts regarding (c) actions attributed to particular defendants that (d) plausibly violated Southward's First Amendment rights or retaliated against her for exercising her First Amendment rights. Therefore, Counts 4 and Count 5, insofar as they are asserted on behalf of Southward, are dismissed.

### IV. Claims Asserted by Kulick

#### A. CEPA (Count 2)

Count 2 of the second amended complaint alleges CEPA violations on behalf of plaintiff Kulick only. A CEPA claim has four essential elements: (1) the employee reasonably believed the complained-of conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) she performed a whistleblowing activity; (3) an adverse employment action was taken; and (4) the adverse employment action occurred because of her whistleblowing activity. *Clayton v. City of Atl. City*, 722 F. Supp. 2d 581, 588-89 (D.N.J. 2010) (citing *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003)).

In the second amended complaint's CEPA count, Kulick alleges that she was dismissed for three reasons: (a) she reported a coworker's tardiness, intoxication, and human-resources misconduct; (b) she complained that the Board failed to make merit payments to Directors (including herself) that were required by a memorandum agreement with the union; and (c) she stopped contributing to Board-backed political and charitable campaigns.

The first amended complaint asserted a CEPA claim based on reasons (a) and (b) only. (1AC ¶¶ 127-61). My earlier opinion dismissed Count 2 of the first amended complaint for failure to state a claim. *Southward*, 2017 WL 111924, at *13-15.

#### 1. Relation Back

Defendants assert that Kulick's new assertion of ground (c) in the second amended complaint is untimely, in that it does not "relate back" to her claims in the first amended complaint. (Def. Br. 4-6).

Under Federal Rule of Civil Procedure 15(c), an amendment to a pleading relates back to the date of the original pleading where "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set

out—or attempted to be set out—in the original pleading." Relation back is structured "to balance the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits." *Glover v. FDIC*, 698 F.3d 139, 145 (3d Cir. 2012) (citing *Krupski v. Costa Conciere S.p.A.*, 560 U.S. 538, 550 (2010)). When an amendment relates back, Rule 15(c) allows a plaintiff to avoid an otherwise-applicable statute of limitations. *Id.* This encourages resolution on the merits, rather than on a technicality. *Id.* At the same time, however,

> Rule 15(c) endeavors to preserve the important policies served by the statute of limitations—most notably, protection against the prejudice of having to defend against a stale claim, as well as society's general interest in security and stability—by requiring "that the already commenced action sufficiently embraces the amended claims."

*Id.* (citing *Nelson v. Cty. of Allegheny*, 60 F.3d 1010, 1014-15 (3d Cir. 1995)).

Application of Rule 15(c)(1)(B) normally entails a "search for a common core of operative facts in the two pleadings." *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 310 (3d Cir. 2004). However, Rule 15(c) is not an "identity of transaction test," such as the rules governing claims or parties. 6A Wright & Miller, Federal Practice and Procedure § 1497 (3 ed. 2010). Rather, "it is well-established that the touchstone for relation back is fair notice, because Rule 15(c) is premised on the theory that 'a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide.'" *Glover*, 698 F.3d at 146 (citing *Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149 n.3 (1984)).

The Third Circuit has provided guidance as to when amended complaints "relate back" to original complaints:

> [O]nly where the opposing party is given fair notice of the general fact situation and the legal theory upon which the amending party proceeds will relation back be allowed. Conversely, amendments

that significantly alter the nature of a proceeding by injecting new and unanticipated claims are treated far more cautiously.

*Id.* (internal quotation marks and citations omitted).

Defendants concede that that they were "on notice" of potential CEPA liability for alleged retaliation regarding (a) Kulick's reporting of a coworker's misconduct and (b) Kulick's complaining that the Board failed to make merit payments. (Def. Br. at 5). But newly-asserted ground (c) (discontinuing contributions to Board-backed political and charitable campaigns), they say, is distinct. As defendants see it, Kulick "now raises the distinctly different claim that she blew an entirely different whistle ... and that defendants retaliated against her for that entirely different reason." (*Id.*).

Although the first amended complaint did not raise ground (c) in precisely that form, I think defendants overstate the case. In Count 2 of the first amended complaint, for example, Kulick alleged that "[it] is a longstanding policy and pattern of the Elizabeth Board of Education ... to solicit contributions and favors in exchange for employment." (1AC ¶ 105). In Count 4 of the first amended complaint, Kulick alleged that she "eventually stopped contributing to Board-backed campaigns" and that, "[f]ollowing her lack of contribution of her time and money," she then was terminated from her position. (1AC ¶¶ 155-57). In short, precisely the same ground was alleged, albeit as a basis for First Amendment, as opposed to CEPA, retaliation. Those earlier allegations, although they did not survive the earlier motion to dismiss, placed defendants on fair notice of the essential facts and even the general legal theory now asserted by Kulick: that defendants required political contributions and terminated Kulick's employment when she balked. I hold that this claim, asserted as ground (c) of the second amended complaint's CEPA claim, relates back and is not barred by the statute of limitations. I therefore go on to consider whether Count 2, including ground (c), states a claim.

## 2. Sufficiency of Kulick's Allegations

The version of Count 2 in the first amended complaint was dismissed without prejudice for failure to state a claim. The question now before the Court is whether the allegations of the second amended complaint have remedied that deficiency. I consider separately the CEPA count's three alleged grounds for retaliation: (a) reporting a coworker's misconduct; (b) complaining that the Board failed to make merit payments to Directors; and (c) ending her contributions to Board-backed political campaigns.

### a. Reporting Gomes's Alleged Misconduct

In the first amended complaint, Kulick failed to "plausibly suggest an inference of causation" between Kulick's reporting of Gomes's tardiness and intoxication in 2010 and her termination four years later in 2014. *Southward*, 2017 WL 111924, at *14. The first amended complaint did not plead, and the circumstances did not plausibly suggest, an inference of causation. *Id.* The second amended complaint does not add additional facts sufficient to bolster any inference of causation. Therefore, Kulick's reporting of Gomes's misbehavior will not sustain a CEPA claim.

### b. Demanding Merit-Based Pay Based on Union Contract

The second component of Kulick's CEPA claim is that she was fired because she complained that the Directors did not receive agreed-upon merit pay. I dismissed this component of Kulick's CEPA claim in the first amended complaint because it did not satisfy the first element of a CEPA claim: that the whistleblowing employee reasonably believed the complained-of conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy. *Southward*, 2017 WL 111924, at *15. As a matter of law, the plaintiff must establish an identifiable "law, or rule or regulation promulgated pursuant to law," N.J. Stat. Ann. § 34:19-3c(1), or else "a clear mandate of public policy concerning the public health, safety, or welfare," N.J. Stat. Ann. § 34:19-3(c)(3); *see Dzwonar*, 828 A.2d at 900-01;

*Mehlman v. Mobil Oil Corp.*, 707 A.2d 1000 (N.J. 1998). As the Supreme Court of New Jersey has explained, "when a plaintiff brings an action pursuant to [CEPA], the trial court must identify a statute, regulation, rule, or public policy that closely relates to the complained-of conduct" and "[t]he trial court can and should enter judgment for a defendant when no such law or policy is forthcoming." *Dzwonar*, 828 A.2d at 901.

As I explained previously, Kulick's complaint that Directors were shorted on their merit pay did not involve the unveiling of a public harm, or the violation of a public policy or rule. Rather, this was a salary dispute between a small group of employees and their employer. *Southward*, 2017 WL 111924, at *14. The second amended complaint, like its predecessor, fails to identify a specific statute, regulation, or public policy contravened by a shortfall in merit pay. Therefore, Kulick's CEPA claim, insofar as it is based on the merit pay dispute, does not survive.

### c. Retaliation for Discontinuing Political Contributions

Kulick also claims that she was terminated in June 2014 because she stopped contributing to Board-backed political and charitable campaigns. Regarding this claim, Kulick does plead the elements of a CEPA claim:

(1) She was "required" to contribute financially to political campaigns in order to keep her job (2AC ¶ 132), and she could reasonably have believed that this conduct was a violation of her First Amendment rights;

(2) She performed a whistleblowing activity by objecting to and refusing to participate in this practice (2AC ¶¶ 133-35);

(3) She was fired; and

(4) Her firing was a result of her failure to contribute to Board-backed campaigns. (2AC ¶ 135).

This claim is far from perfectly pled; for example, it suffers from the same group-pleading defect that infects other counts, although not quite to the same

degree. Count 2 will be in peril if the wrongful acts of individual Board members are not identified in discovery. Still, a CEPA claim is adequately alleged.

To summarize, Kulick's CEPA claim is dismissed insofar as it rests on alleged retaliation for reporting coworker misconduct and disputing merit pay. The motion to dismiss is denied, however, as to a CEPA claim based on alleged retaliation for stopping political contributions.

### B. First Amendment and NJCRA (Counts 3, 5)

Kulick's First Amendment claims survived the defendants' motion to dismiss the first amended complaint. Now, defendants assert that (i) the claims for discrete acts of retaliation prior to June 2013 are time barred, and (ii) that Fajardo was not a state actor.

### 1. Discrete Acts and the Statute of Limitations

There is a two-year statute of limitations for these First Amendment claims. A claim accrues at the time of any act that is "discrete" and independently actionable. *See Southward*, 2017 WL 111924, at \*12 (discussing continuing violation doctrine and discrete acts of First Amendment retaliation).

Defendants argue that any acts of retaliation concerning events from 2009 to May 2013, such as threats for refusing to contribute to political campaigns, should be considered individually actionable events. (Def. Br. 7-8). If these events are individually actionable, they would be barred by the two-year statute of limitations. (*Id.*). Plaintiffs counter that these acts were not "discrete," but part of a "continuing violation" extending into the limitations period. (Pl. Br. 13).

My prior opinion discussed the manner in which the Supreme Court established a "bright-line distinction between discrete acts, which are individually actionable, and acts which are not individually actionable but may be aggregated to make out a hostile work environment claim." *O'Connor*, 440

F.3d 125, 127 (3d Cir. 2006). Claims based on discrete acts must be brought within the statute-of-limitations period, which runs from the date of the discrete act. *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). *Morgan* identifies certain discrete acts: termination, failure to promote, denial of transfer, refusal to hire, etc. *Morgan*, 536 U.S. at 114.

A plaintiff must take the bitter with the sweet here: Fairly minor acts can be actionable under a First Amendment retaliation theory, but that means that even fairly minor retaliatory acts will trigger the *Morgan* rule "that individually actionable allegations cannot be aggregated." *O'Connor*, 440 F.3d at 127. As the Third Circuit has explained,

> First Amendment retaliation claims are always individually actionable, even when relatively minor. Even "an act of retaliation as trivial as failing to hold a birthday party for a public employee," if "intended to punish her for exercising her free speech rights," may be actionable if under the circumstances it would be sufficient to "deter a person of ordinary firmness" from exercising his or her First Amendment rights.

*Id.* at 127-28 (citing *Suppan v. Dadonna*, 203 F.3d 228, 234-35 (3d Cir. 2000) (citing *Rutan v. Republican Party*, 497 U.S. 62, 76 n.8 (1990))). As a cause of action for First Amendment retaliation results from "all but truly de minimis violations," each retaliatory action creates an independent claim that starts the statute-of-limitations clock. *Id.* at 128 (citing *Suppan*, 203 F.3d at 234-35).

Because this action was filed on June 2, 2015, the relevant two-year statute of limitations bars any First Amendment retaliation claim based on a discrete act that occurred before June 2, 2013. As to them, the motion to dismiss Count 5 (as it pertains to Kulick) and Count 3 is granted. The motion to dismiss those Counts will be denied insofar as the claims rest on events after June 2, 2013. Later acts, such as Kulick's retaliatory termination in June 2014, remain actionable on a First Amendment retaliation theory.

## 2. Defendant Fajardo as a State Actor

Defendants argue that the Section 1983 and NJCRA claims against defendant Fajardo arising out of conduct from June 2010 to May 2014 should be dismissed. (Def. Br. 8). Since Fajardo was not a Board member during that time period, they argue, he was "therefore not a state actor" and cannot be held liable under Section 1983 or NJCRA. (Def. Br. 8-9).

Section 1983, of course, requires action under color of state law, and that requirement is commonly met by an allegation that the defendant is a state official or employee. But there is not always a bright-line distinction between state employees and others for the purposes of Section 1983 liability. "[T]o act 'under color of' state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980). Private parties can be state actors if they are "jointly engaged with state officials in the challenged action." *Id.*; *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150-52 (1970) (finding plaintiff is entitled to relief under Section 1983 against a private party if she can prove that the private party and police officer "reached an understanding" to cause her arrest on impermissible grounds). Whether or not a private person is a state actor under Section 1983 can be, under such circumstances, a "fact-bound inquiry." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982)).

The second amended complaint alleges that defendant Fajardo exercised *de facto* Board authority, acting behind the scenes in concert with Board members. (At the time of Kulick's dismissal in 2014, he had become a Board member.) Whether defendant Fajardo acted "under color of" state law before he joined the Board—to the extent it remains relevant, given the statute of limitations bar—involves questions of fact not suitable for resolution on a motion to dismiss.

The motion to dismiss Section 1983 and NJCRA claims against defendant Fajardo is therefore denied, without prejudice to renewal of those contentions in connection with summary judgment.

## V.    New Jersey RICO

In Count 6 of their second amended complaint, Southward and Kulick jointly assert a claim under NJRICO, alleging that defendants conducted the affairs of the Board through a pattern of racketeering activity. As before, the plaintiffs have failed to state a claim upon which relief can be granted. The prior discussion is incorporated here; I only supplement it as necessary to encompass the new allegations.

Pursuant to NJRICO, it is unlawful to be "employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." N.J. Stat. Ann. § 2C:41-2(c). The elements of a claim under NJRICO are "(1) the existence of an enterprise; (2) that the enterprise engaged in activities that affected trade or commerce; (3) that the defendant was employed by or associated with the enterprise; (4) that the defendant participated in the conduct of the affairs of the enterprise; (5) that the defendant participated through a pattern of racketeering activity; and (6) that the plaintiff was injured as a result of the conspiracy." *Galicki v. New Jersey*, No. 14-169, 2015 WL 3970297, at *7 (D.N.J. June 29, 2015).

The sixth ("as a result") element is a statutory standing requirement that undercuts much of the basis for plaintiffs' NJRICO claims. To establish statutory standing to institute a civil action under NJRICO, "it must be shown that 'plaintiff's harm was proximately caused by the NJRICO predicate acts alleged, *i.e.* that there was a direct relationship between plaintiff's injury and defendant's conduct." *Interchange State Bank v. Veglia*, 668 A.2d 465, 472 (N.J. Super. Ct. App. Div. 1995) (citing *First Nationwide Bank v. Gelt Funding Corp.*,

24

27 F.3d 763, 769 (2d Cir. 1994)); *see also Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 279 (1992) ("[A] RICO plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by [reason of] the conduct constituting the violation." (internal quotation marks omitted)).

Plaintiffs' NJRICO claim alleges, in part, predicate acts of falsification of records. Indeed, Southward's NJRICO allegations relate almost exclusively to acts such as falsification of records. (2AC ¶¶ 258-69). However, the complaint does not allege any direct injury to plaintiffs "as a result of" the defendants' alleged falsification of maternity leave, school lunch, or vacation-time records. Nor does any direct injury to Southward suggest itself; if anyone was defrauded, it was the school district or the relevant federal program.

On the other hand, plaintiffs' NJRICO claims also allege predicate acts of bribery and extortion. These, it seems, would entail a direct injury to the extent they were directed against a plaintiff. For example, plaintiffs allege that they were extorted into spending their own money on Board-backed political campaigns. Plaintiffs thus might possess statutory standing to assert NJRICO claims based on such predicate acts of extortion.

Substantively, however, the allegations are inadequate. The second amended complaint fails to provide each defendant with notice of his or her alleged participation in a racketeering enterprise through criminal acts of extortion and bribery. To satisfy the NJRICO pleading standard, plaintiffs must provide *each* defendant with *individual* notice—by *specific* factual allegations— of his or her purported participation in the racketeering enterprise. *See Galicki v. New Jersey*, No. 14-169, 2015 WL 3970297, at *8 (D.N.J. June 29, 2015). I explained this in connection with the dismissing the NJRICO count of the prior first amended complaint:

> I have indulged the plaintiffs in regard to specifying each individual
> defendant's involvement in the CEPA and First Amendment
> claims.... As to NJRICO, however, that indulgence is stretched past

25

the breaking point. Here, each defendant's participation cannot be inferred from employer status and is not just a generic prerequisite for liability; rather, it is woven into the substantive elements of NJRICO.

*Southward*, 2017 WL 111924, at *16. As I stated then, "NJRICO is a complex statute which, by its very nature, necessitates a certain level of specificity in pleading." *Id.* at *17. Thus I required the plaintiffs to state the specifics of their NJRICO claim. *Id.* After all, they are accusing the defendants of committing crimes; it is not too much to ask that, consistent with civil pleading standards, they reasonably identify the particular criminal acts involved.

Plaintiffs simply do not provide sufficient factual content to support a reasonable inference that each defendant joined in and conducted the affairs of an enterprise through the commission of predicate crimes—specifically, bribery[6] and extortion.[7]

---

[6]    Under New Jersey law, "A person is guilty of bribery if he directly or indirectly offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another:

   a. Any benefit as consideration for a decision, opinion, recommendation, vote or exercise of discretion of a public servant, party official or voter on any public issue or in any public election; or

   b. Any benefit as consideration for a decision, vote, recommendation or exercise of official discretion in a judicial or administrative proceeding; or

   c. Any benefit as consideration for a violation of an official duty of a public servant or party official; or

   d. Any benefit as consideration for the performance of official duties...."

N.J. Stat. Ann § 2C:27-2.

[7]    Under New Jersey law, "A person is guilty of theft by extortion if he purposely and unlawfully obtains property of another by extortion. A person extorts if he purposely threatens to:

   a. Inflict bodily injury on or physically confine or restrain anyone or commit any other criminal offense;

   b. Accuse anyone of an offense or cause charges of an offense to be instituted against any person;

As for Southward, as I have said, the allegations relate almost exclusively to acts such as falsification of records, as to which she lacks standing. What remain are allegations such as the contention that defendant Board members approached Southward "countless times" to purchase tickets "in exchange for continuing employment." (2AC ¶ 269). These allegations are simply too vague and nonspecific to meet the *Twombly/Iqbal* pleading standard as to the crime of extortion.

As for Kulick, the NJRICO allegations of extortion and bribery are more direct, but still impermissibly nonspecific. Recall that a plaintiff must provide *each* defendant with notice of his or her alleged participation in the racketeering enterprise. Most of Kulick's NJRICO allegations simply equate ordinary political campaign fundraising with extortion. For example, Kulick states that she was "routinely given flyers, tickets, emails, and other print requests to purchase tickets to political fundraisers and to contribute to political campaigns." (2AC ¶ 277). She was "frequently called and emailed to ask for help" on campaign work. (2AC ¶ 272). Such allegations fall short of a plausible, factual presentation of the elements of predicate RICO *criminal* offenses of extortion or bribery.

---

c. Expose or publicize any secret or any asserted fact, whether true or false, tending to subject any person to hatred, contempt or ridicule, or to impair his credit or business repute;

d. Take or withhold action as an official, or cause an official to take or withhold action;

e. Bring about or continue a strike, boycott or other collective action, if the property is not demanded or received for the benefit of the group in whose interest the actor purports to act;

f. Testify or provide information or withhold testimony or information with respect to another's legal claim or defense; or

g. Inflict any other harm which would not substantially benefit the actor but which is calculated to materially harm another person...."

N.J. Stat. Ann. § 2C:20-5.

Kulick reverts to group denunciations and the passive voice, failing to specify how individual defendants participated in a RICO enterprise, and failing to connect their acts to the specific elements of the crimes of bribery or extortion. Thus, she alleges that defendants as a group ("Fajardo and Monteiro and other Defendant Board Members") "sought" to commit extortion by "telling" her to purchase tickets to a fundraiser. (2AC ¶ 272). Or Kulick relates nonspecifically that she "complained" that she was threatened, without having specifically established a threat. (2AC ¶ 132). No specific criminal extortionate threat by any individual said to be a member of the racketeering enterprise is described.

Combing the rest of the complaint, I find no additional allegations sufficient to lend substance to Kulick's claims of bribery and extortion. In 2009, for example, Annie Rooney, defendant Munoz's secretary (who is not a defendant in the litigation), allegedly "told Ms. Kulick that she was expected to purchase tickets to the Board members' political fundraisers and events...." (2AC ¶ 173). There does not appear to be a "purposeful threat" or solicitation "as consideration" for continued employment.

As to defendant Fajardo, Kulick makes somewhat more specific allegations, and, at the motion to dismiss stage, I must accept them as true. Defendant Fajardo allegedly told Kulick there were "no excuses" for failing to contribute to his fundraising entity (2AC ¶ 271), left "intimidating voicemail messages" on her home and cellular phone (2AC ¶ 278), and "verbally intimidated and threatened" Kulick. (2AC ¶ 281). Still, even these allegations as to Fajardo are general, suggesting that harassment occurred without providing any factual content that would permit an inference that he conducted the affairs of an enterprise through two or more distinct but interrelated criminal acts of extortion or bribery.[8]

---

[8]     As I pointed out in the prior opinion at n.13, the plaintiffs voluntarily dropped their parallel claims under the federal RICO statute. No explanation appears, but one of the consequences is that they have circumvented the requirement that they furnish

Therefore, I will grant defendants' motion to dismiss Count 6, the NJRICO claim.[9]

## VI.  Claims Against Pablo Munoz

Defendants assert that the claims against Pablo Munoz should be dismissed. Pablo Munoz, the former Superintendent, ended his employment in October 2013, before the non-time-barred acts that form the basis of the claims in Counts 1–5. (Def. Br. 7–9). Plaintiffs concede that the non-RICO claims against defendant Munoz are time barred. Since I also have held that the plaintiffs have not sufficiently pled a NJRICO claim in Count 6, the result is that no claims against defendant Munoz remain.

## VII.  Dismissal With Prejudice

An initial dismissal for failure to state a claim will ordinarily be entered without prejudice to amendment. *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004). *Accord Phillips v. Cty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008) (citing *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002)).  In keeping with that principle, my prior opinion dismissed portions of the first amended complaint without prejudice. In a lengthy opinion, I instructed the plaintiffs as to what a second amended complaint would have to allege in order to survive a motion to dismiss. This is not a case in which facts and theories are evolving or coming to light; rather, the plaintiffs have thrice been called upon to plead with the requisite specificity facts that would naturally be known to or ascertainable by them. The plaintiffs have now filed their second amended complaint, but for the most part it fails to remedy the deficiencies of the first. Plaintiffs have had ample opportunity to plead with the specificity required by

a RICO case statement. Such a statement imposes a duty of reasonable inquiry and requires the plaintiff to specify in detail the who, what, when, where, and how as to each RICO element. *See* D.N.J. Loc. Civ. R. 16.1(d)(4) & App'x O.

9     Since the plaintiffs have not sufficiently pled a NJRICO claim, I do not reach certain other grounds asserted by the defendants. These include the question of whether the Board can be both a NJRICO enterprise and a defendant.

*Twombly* and *Iqbal*. This time, my dismissal of portions of the second amended complaint will be with prejudice.

### VIII. Conclusion

Defendants' Rule 12(b)(6) motion to dismiss the second amended complaint is GRANTED in part and DENIED in part. For the reasons stated in Section VII, *supra*, all dismissals are with prejudice.

The motion to dismiss Count 1 is granted only as to claims arising before June 2, 2014; it is denied as to claims based on later events. The motion to dismiss Count 2 is granted in relation to reporting Gomes's alleged misconduct and demanding merit-based pay; it is denied in relation to retaliation for Kulick's discontinuing her political contributions. The motion to dismiss Count 5 (in relation to Kulick) and Count 3 is denied. The motion to dismiss Count 5 (in relation to Southward) and Count 4 is granted. The motion to dismiss Count 6 is granted. The result of the foregoing is that all claims against defendant Munoz are dismissed.

For ease of reference, here are the claims that remain:

Count 1: CEPA (Southward), June 2, 2014 and later;

Count 2: CEPA (Kulick), June 2, 2014 and later (retaliation for discontinuing contributions only)

Counts 3 and 5: § 1983 and NJCRA First Amendment retaliation (Kulick), June 2, 2013 and later.

Dated: October 2, 2017

**KEVIN MCNULTY**
**United States District Judge**